Neva DAY, an individual, Plaintiff,

v.

**SEARS HOLDINGS CORPORATION; Sears Holdings Management Corporation; Sears, Roebuck and Company; Sears Outlet Stores, LLC, and Does 1–100, inclusive, Defendants.**

Case No. CV 11–09068 MMM (PJWx).

United States District Court, C.D. California.

March 13, 2013.

1148

Anahit Galstyan, Andrew James Kazakes, Edward Yun, Mark Weidmann, Weidmann and Yun PC, Los Angeles, CA, for Plaintiff.

Alden J. Parker, Chelcey Emiko Lieber, Weintruab Genshlea Chediak Tobin & Tobin, Shauna N. Correia, Bullicant Houser Bailey PC, Sacramento, CA, for Defendant.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

MARGARET M. MORROW, District Judge.

On October 6, 2011, Neva Day filed this action against Sears Holdings Corporation, Sears Holdings Management Corporation, Sears, Roebuck & Co., Sears Outlet Stores, LLC, and certain fictitious defendants.[1] Day pled eleven causes of action: (1) gender discrimination in violation of the Fair Employment and Housing Act ("FEHA"); (2) gender discrimination in violation of public policy; (3) retaliation for complaints of gender discrimination in vio-

---

1. Notice of Removal, Docket No. 1 (Nov. 1, 2011), Exh. A ("Complaint").

lation of FEHA; (4) retaliation for complaints of gender discrimination in violation of public policy; (5) retaliation for complaints of sexual harassment in violation of FEHA; (6) retaliation for complaints of sexual harassment in violation of public policy; (7) wrongful termination in violation of public policy based on complaints of health and/or safety; (8) violation of California Labor Code § 232.5; (9) wrongful termination in violation of public policy based on violation of Labor Code § 232.5; (10) failure to take reasonably necessary steps to prevent discrimination, harassment, and retaliation in violation of FEHA; and (11) failure to take immediate appropriate action to stop unlawful harassment.[2] The action was removed to this court on November 1, 2011.[3] On October 19, 2012, defendants filed a motion for summary judgment on all of Day's claims or alternatively, partial summary judgment.[4] Day opposes defendants' motion.[5]

# I. BACKGROUND

Day was a regional sales director for Sears Outlet from approximately June 2009 to October 4, 2010.[6] Sears Outlet president Jamie Brooks made the decision to hire Day.[7] At all relevant times, Day reported to Brooks and was directly supervised by Vance Rea, the national sales director for Sears Outlet.[8]

## A. The Grant Investigation

On August 18, 2010, Day spoke to Rea concerning issues she had with Mark Grant, the national training manager for Sears Outlet.[9] Day told Rea that Gregory Wold, a district manager for Sears Outlet, had complained about Grant's behavior.[10] According to Wold, Grant made repeated remarks to him regarding women's bodies and Grant's extramarital affairs.[11] Day also conveyed to Rea reports that Grant and Casey Calderwood, another upper-level manager at Sears Outlet, had driven while intoxicated during a business trip.[12] As national sales director, it was Rea's responsibility to conduct an initial investigation regarding complaints and determine whether they merited the initiation of a formal human resources investigation.[13] Rea asked that Day obtain a written state-

2. Complaint at 1–2.

3. Notice of Removal at 1.

4. Motion for Summary Judgment ("MSJ"), Docket No. 35 (Oct. 19, 2012); see also Reply in Support of Motion for Summary Judgment ("Reply"), Docket No. 45 (Nov. 5, 2012).

5. Opposition to Motion for Summary Judgment ("Opp."), Docket No. 36 (Oct. 29, 2012).

6. Separate Statement of Uncontroverted Facts ("SUF"), Docket No. 35 (Oct. 19, 2012), ¶ 1; Disputed Material Facts ("SGI"), Docket No. 38 (Oct. 29, 2012), ¶ 1. Day had previously worked at Sears, Roebuck and Co. from 1998 to 2003. (SUF, ¶ 4; SGI, ¶ 4).

7. Declaration of Alden Parker ("Parker Decl."), Docket No. 35 (Oct. 19, 2012), Exh. 14 ("Brooks Decl."), ¶ 3.

8. SUF, ¶¶ 6–8; SGI, ¶¶ 6–8.

9. SUF, ¶ 9; SGI, ¶ 9.

10. SUF, ¶ 9; SGI, ¶ 9.

11. Declaration of Neva Day ("Day Decl."), Docket No. 36 (Oct. 29, 2012), ¶ 24. Defendants object that this testimony is hearsay. (Defendant's Objections to Plaintiff's Evidence ("Objections"), Docket No. 45 (Nov. 5, 2012).) Grant's statements, however, are not being offered for the truth of the matter asserted since it is irrelevant whether Grant actually had the extramarital affairs he discussed. Rather, the statements are offered for their effect on the listener, Wold, who was purportedly uncomfortable due to the nature of the conversation. Defendants' hearsay objection is therefore overruled.

12. Day Decl., ¶ 26.

13. SUF, ¶ 10; SGI, ¶ 10. Day does not dispute this fact, but contends that Rea assured her he would maintain the information she provided in confidence and not discuss her complaint with anyone else, including human

ment from Wold;[14] instead of doing so, Day herself prepared and sent a written statement to Rea on August 25, 2010. Day's statement described observations and reports of Grant's inappropriate behavior, including "picking up women" and "excessive drinking" while on business trips.[15] Rea gave Day's email to Chris Jemo, a human resources officer.[16] He also sent Day an email, in which he advised that the company was investigating the matters she reported, and that because all company investigations were confidential, she should not discuss the investigation or the subject of the allegations with anyone else.[17]

After receiving Day's email, Jemo began a formal human resources investigation concerning the complaints against Grant.[18] On August 30, 2010, Jemo and Day met in Denver, Colorado, where Jemo was conducting an unrelated sexual harassment investigation.[19] At the meeting, Jemo requested additional, more specific details regarding Day's complaints.[20] On September 10, 2010, Day sent Jemo an email with additional information.[21] Jemo responded, stating that the information still lacked specifics, and that Day needed to provide "details around name[s] of associates," and a "paragraph by paragraph" breakdown that identified which employees had made which complaints.[22] Jemo stated that Day was "interfering in a company investigation" by not providing the details he requested.[23] He also reminded Day that the investigation was confidential and should not be discussed with anyone other than Jemo and Rea.[24]

On September 16, 2010, Jemo interviewed Day in person concerning the Grant investigation.[25] Between September 22 and 30, Jemo interviewed thirteen other witnesses, including Wold, Rea, and Grant.[26] Jemo ultimately concluded that Grant had acted unprofessionally and prepared a Documentation of Performance Issues warning.[27] Grant was required to demonstrate improvement in four general categories: "Professional Demeanor;" "Interaction with Female Associates;" "Professional Language and Subjects;" and

resources. (SGI, ¶ 10). This issue is discussed in greater detail *infra.*

**14.** Parker Decl., Exh. 13 ("Rea Decl."), ¶ 4.

**15.** SUF, ¶ 17; SGI, ¶ 7; see also Day Decl., ¶ 28.

**16.** SUF, ¶ 19; SGI, ¶ 19.

**17.** Rea Decl., Exh. C (email instructing Day that "all investigations are confidential" and that she must "not discuss this investigation or the subject of the allegations with anyone, including those who have raised concerns with you").

**18.** SUF, ¶ 25; SGI, ¶ 25. Although she disputes the neutrality of the investigation, Day does not dispute that the investigation occurred.

**19.** SUF, ¶ 27; SGI, ¶ 27. Day asserts that she was invited to participate in the unrelated investigation as an "appropriate female," and

tasked with making the investigation "look good." (Day Decl., ¶¶ 89, 90).

**20.** SUF, ¶ 29; SGI, ¶ 29.

**21.** SUF, ¶ 36; SGI, ¶ 36.

**22.** Parker Decl., Exh. 12 ("Jemo Decl."), Exh. C.

**23.** *Id.*

**24.** *Id.*

**25.** SUF, ¶ 47; SGI, ¶ 47.

**26.** SUF, ¶¶ 77–83; SGI, ¶¶ 77–83. Although Day disputes the neutrality of the investigation, she does not dispute that these interviews were conducted.

**27.** SUF ¶ 86; SGI, ¶ 86; see also Rea Decl., Exh. E ("Documentation of Performance Issues").

"Behavior Away from the Store."[28] The warning was signed by both Grant and Rea.[29]

## B. The Day Investigation

On September 1, 2010, while the Grant investigation was ongoing, Day had a conversation with Margaret Lawless, the Director of Soft–Lines for Sears Outlet.[30] Day told Lawless she was concerned with Rea's handling of her complaint, and questioned his integrity and trustworthiness.[31] Day asserts she specifically said she could not provide names or details regarding her complaint because there was an ongoing investigation.[32]

Following this conversation, Lawless advised Brooks that Day had initiated a conversation with her regarding a human resources investigation.[33] Brooks instructed Lawless to advise Rea that Day had expressed concerns.[34] On September 9, at Rea's request, Lawless prepared a written statement detailing the conversation that took place between her and Day.[35] In her report, Lawless stated that ·Day asked whether she knew of the statement Day had given Rea regarding "an individual."[36] Lawless stated that Day expressed frustration with the fact that her complaint had been given to human resources despite her wish that it remain confidential.[37] Although Day did not identify the individuals whose complaints she relayed, she did remind Lawless of a business meeting they had had in Texas in which Grant and Calderwood rented a car and drove around to "experience the night life in Dallas."[38]

Jemo subsequently opened an investigation to determine whether Day had breached defendants' policy that human resources investigations are confidential by speaking with Lawless.[39] On September 16, 2010, Jemo and a witness interviewed Day regarding the Grant investigation.[40] At both the beginning and the end of the interview, Jemo reminded Day to maintain confidentiality with respect to the investigation.[41] During the interview, Day was asked whether she had talked with anyone regarding the Grant investigation; Day did not state that she had spoken with Lawless.[42]

28. Documentation of Performance Issues at 1.

29. *Id.*

30. SUF, ¶ 40; SGI, ¶ 40.

31. Day Decl., ¶ 46.

32. *Id.*, ¶ 47.

33. SUF, ¶ 41; SGI, ¶ 41.

34. Exhibits A–N in Support of Opposition to Motion for Summary Judgment ("Exhibit List"), Docket No. 44 (Nov. 1, 2012), Exh. N ("Lawless Depo.") at 135:9–15 (Q: Did [Brooks] tell you to go to [Rea]? A: I believe so, yes. Q: Did he say—did he give you any specific instructions about what to tell [Rea]? A: He did not. Q: He just said talk to [Rea] about it? A: You should let [Rea] know").

35. SUF, ¶ 43; SGI, ¶ 43; see also Parker Decl., Exh. 8 ("Lawless Statement").

36. *Id.*

37. *Id.*

38. *Id.*

39. SUF, ¶¶ 44, 71; SGI, ¶¶ 44, 71. For each of the undisputed facts cited regarding the investigation of Day, Day argues that Jemo was not neutral, and disputes the conclusions reached at the conclusion of the investigation. Day, however, does not dispute basic facts concerning the investigation, such as the fact that interviews occurred on certain dates. As a result, the court deems these facts undisputed.

40. SUF, ¶ 47; SGI, ¶ 47.

41. SUF, ¶ 48; SGI, ¶ 48.

42. Day Depo. at 322:5–18 ("Q: During this conversation on the 16th, you were asked if you've talked with anyone about the investigation; right? A: Yes. Q: And you answered no; correct? A: Possi—I might have said my

On September 20, 2010, Day was again interviewed by Jemo, as well as by Don Strand, a regional human resources director, and Pamela Fowler, director of human resources consultants for Sears Holdings Management Corp.[43] During this interview, Day signed an "Associate Acknowledgment" form, which stated that "[a]ssociates who breach confidentiality are subject to disciplinary action, up to and including termination."[44] Day was again asked on September 20 whether she had spoken with anyone regarding the Grant investigation.[45] She once again did not report that she had spoken with Lawless; it was not until later in the interview, after the questioners had moved on to a new topic, that Day volunteered that she had spoken with Lawless.[46]

On September 30, 2010, William O'Malley, director of corporate investigations, was asked to conduct independent interviews concerning whether Day had breached defendants' confidentiality policy.[47] O'Malley concluded that she had, and reported his findings to Fowler and Brooks.[48] On October 4, 2010, following completion of the Day investigation, Brooks and Fowler advised Day that they were terminating her employment because she had violated defendants' confidentiality policy.[49] Susan Leach, vice president of human resources operations, reviewed the termination decision and the evidence sup-

mom, possibly, but—Q: Do you remember saying at first no, and then you said, well, you may have mentioned it with you boyfriend? A: It was with somebody. So yes. Q: Okay. But it was only the boyfriend you mentioned at that point; correct? A: Correct"). Day asserts in her declaration, however, that the interviewer's questions were phrased in such a way that they did not seek information about communications with Lawless. (Day Decl., ¶ 58).

43. SUF, ¶ 53; SGI, ¶ 53. As noted, Day disputes how defendants portray the interview, but concedes the interview took place.

44. Jemo Decl., Exh. H.

45. Day Depo. at 119:4–6 ("Q: That question [about speaking with anyone about the investigation] was asked of you several times; right? A: Correct).

46. Id. at 119:21–23 ("Q: When did you indicate that you had spoken with Margaret about the investigation? A: We [had] moved on to a third issue"); id. at 120:14–18 ("A: I went I was in a car with Margaret and I asked her if I could have her confidence and talk to her if I could trust Vance. And that was the statement that I made. And I asked to go back and I made that statement").

47. SUF, ¶ 58; SGI, ¶ 58. Day disputes the neutrality of O'Malley's investigation, but not that it occurred.

48. SUF, ¶ 61; SGI, ¶ 61; see also Parker Decl., Exh. 16 ("O'Malley Decl."), ¶ 5. Day argues that O'Malley's deposition testimony contradicts the statement in his declaration that he concluded she had breached the confidentiality policy. (SGI, ¶ 61). At his deposition, O'Malley stated only that it was not his role to make a final decision as to whether Day had breached the policy; rather, his role was to gather and report facts. (Notice of Lodging of Original Deposition Transcripts, Docket No. 46 (Nov. 8, 2012), Deposition of William O'Malley at 60:22–61:5). Nowhere in his testimony does O'Malley contradict the statement in his declaration that he concluded Day had breached confidentiality. O'Malley could have reached this conclusion even if he was not the ultimate decision-maker.

49. SUF, ¶ 62; SGI, ¶ 62. Defendants assert that Brooks and Fowler concluded Day had breached confidentiality, lied to investigators, and failed to cooperate in the Grant investigation. (Brooks Decl., ¶¶ 7–8; Parker Decl., Exh. 15 ("Fowler Decl."), ¶¶ 7–8). Day contends that at the time she was terminated, she was told only that she had breached confidentiality. (Day Decl., ¶ 71). In defendants' response to Day's special interrogatory requesting an explanation for her termination, defendants stated only that she had breached the company's confidentiality policy. (Declaration of Edward Yun ("Yun Decl."), Docket No. 36 (Oct. 29, 2012), Exh. 52 at 3).

porting it and concluded that Day's termination was consistent with company policy and was warranted.[50]

## II. DISCUSSION

### A. Legal Standard Governing Motions for Summary Judgment

A motion for summary judgment must be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R.CIV.PROC. 56(c). A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); see also *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.... [S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. On an issue as to which the nonmoving party will have the burden of proof, however, the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case. See *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548. If the moving party meets its initial burden, the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, "specific facts showing that there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 250, 106 S.Ct. 2505; FED.R. CIV. PROC. 56(e)(2).

Evidence presented by the parties at the summary judgment stage must be admissible. FED.R.CIV.PROC. 56(e)(1). In reviewing the record, the court does not make credibility determinations or weigh conflicting evidence. Rather, it draws all inferences in the light most favorable to the nonmoving party. See *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir.1987). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. See *Falls Riverway Realty, Inc. v. Niagara Falls*, 754 F.2d 49, 56 (2d Cir.1985); *Thornhill Pub. Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir.1979).

### B. Whether Defendants Are Entitled to Summary Judgment on Day's First and Second Claims for Relief[51]

Defendants seek summary judgment on

---

**50.** Parker Decl., Exh. 17 ("Leach Decl."), ¶ 4. Day asserts that Leach's declaration is a "sham" and that her averments are "false." (SGI, ¶ 65.) She proffers no evidence, however, contradicting Leach's testimony that she reviewed the termination decision and concluded it was proper.

**51.** Day's first and second causes of action allege gender discrimination in violation of FEHA and gender discrimination in violation of public policy respectively. The second gender discrimination claim is derivative of the FEHA claim, however, in that it alleges that defendants violated public policy by discriminating against Day in violation of FEHA. (Complaint, ¶¶ 33–34). Accordingly, the court addresses both claims together.

Day's first and second claims, which alleges gender discrimination and wrongful termination in violation of public policy.

### 1. Legal Standard Governing FEHA Actions

■ FEHA prohibits employers from discriminating against employees on various bases, including gender. CAL. GOV'T CODE § 12940(a). In evaluating discrimination claims under FEHA, California courts look to federal precedent governing analogous federal discrimination laws. See *Guz v. Bechtel National, Inc.,* 24 Cal.4th 317, 354, 100 Cal.Rptr.2d 352, 8 P.3d 1089 (2000) ("Because of the similarity between state and federal employment discrimination laws, California courts look to pertinent federal precedent when applying our own statutes.... In particular, California has adopted the three-stage burden-shifting test established by the United States Supreme Court for trying claims of discrimination ... based on a theory of disparate treatment" (citations omitted)); *Caldwell v. Paramount Unified School District,* 41 Cal.App.4th 189, 195, 48 Cal. Rptr.2d 448 (1995); *Mixon v. Fair Employment & Housing Comm.,* 192 Cal. App.3d 1306, 1317, 237 Cal.Rptr. 884 (1987).

Accordingly, under FEHA, a plaintiff may establish a *prima facie* case of discrimination either by adducing direct evidence of discriminatory intent, or by satisfying the first prong of the burden-shifting test outlined in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).[52] See *Vasquez v. County of Los Angeles,* 349 F.3d 634, 640 (9th Cir.2004) ("For a *prima facie* case, Vasquez must offer evidence that 'give[s] rise to an inference of unlawful discrimination,' either through the framework set forth in *McDonnell Douglas Corp. v.*

*Green* or with direct or circumstantial evidence of discriminatory intent"); *Guz,* 24 Cal.4th at 354, 100 Cal.Rptr.2d 352, 8 P.3d 1089 ("This so-called *McDonnell Douglas* test reflects the principle that direct evidence of intentional discrimination is rare, and that such claims must usually be proved circumstantially").

In *McDonnell Douglas Corp.,* the Supreme Court held that plaintiff bears the initial burden of establishing by a preponderance of the evidence a *prima facie* case of improper discrimination. If plaintiff succeeds in proving a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the employment action. Should defendant carry this burden of production, the burden of proof shifts back to the plaintiff to demonstrate that defendant's asserted reason is pretextual. *McDonnell Douglas Corp.,* 411 U.S. at 802, 804, 93 S.Ct. 1817. See also *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 252–253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

Thus, a plaintiff seeking to defeat summary judgment must establish a *prima facie* case and, once defendant has articulated a legitimate, nondiscriminatory reason for its action, raise triable issues of fact as to whether the articulated reason is pretextual. *Sischo–Nownejad v. Merced Community College District,* 934 F.2d 1104, 1110 (9th Cir.1991); see also *Nidds v. Schindler Elevator Corp.,* 113 F.3d 912, 917–918 (9th Cir.1997) ("[t]o ... survive summary judgment, [plaintiff] must produce enough evidence to allow a reasonable factfinder to conclude either: (a) that the alleged reason for [plaintiff's] dis-

---

**52.** Day relies on the *McDonnell Douglas* burden-shifting test. She does not adduce direct evidence of discriminatory animus.

charge was false, or (b) that the true reason for his discharge was a discriminatory one").

## 2. Whether Day Has Established a *Prima Facie* Case of Gender Discrimination

"To establish a prima facie case, a plaintiff must offer evidence that 'give[s] rise to an inference of unlawful discrimination.' ... 'The prima facie case may be based either on a presumption arising from the factors such as those set forth in *McDonnell Douglas* ..., or by more direct evidence of discriminatory intent'" *Cordova v. State Farm Ins. Cos.*, 124 F.3d 1145, 1148 (9th Cir.1997) (quoting *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994)). "The specific elements of a prima facie case may vary depending on the particular facts." *Guz*, 24 Cal.4th at 355, 100 Cal.Rptr.2d 352, 8 P.3d 1089 (citing *Burdine*, 450 U.S. at 253 n. 6, 101 S.Ct. 1089). "Generally, the plaintiff must provide evidence that (1) [s]he was a member of a protected class, (2) [s]he was qualified for the position [s]he sought or was performing competently in the position [s]he held, (3) [s]he suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory motive," e.g., similarly-situated individuals outside her protected class were treated more favorably. *Guz*, 24 Cal.4th at 355, 100 Cal.Rptr.2d 352, 8 P.3d 1089. A plaintiff also "must prove by a preponderance of the evidence that there was a 'causal connection' between [her] protected status and the adverse employment decision." *Mixon v. Fair Employment & Housing Comm'n*, 192 Cal.App.3d 1306, 1319, 237 Cal.Rptr. 884 (1987).

There is no doubt that Day was a member of a protected class, and that she suffered an adverse employment action. There is also no dispute that Day was performing her job adequately. Defendants argue, however, that there is no evidence of discriminatory motive and no causal connection between Day's protected status and their decision to terminate her employment.[53] Day counters that she has raise an inference of discriminatory motive by adducing evidence that defendants fostered a "boys' club" working atmosphere that led to her termination.[54]

Defendants assert that Brooks was responsible both for hiring and firing Day, and thus there is a strong inference that the decision to fire her was not based on her gender.[55] "[W]here the same actor is responsible for both the hiring and the firing of a discrimination plaintiff, and both actions occur within a short period of time, a strong inference arises that there was no discriminatory motive." *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270–271 (9th Cir.1996); see also *Coghlan v. American Seafoods Co. LLC*, 413 F.3d 1090, 1096 (9th Cir.2005) ("[A]n employer's initial willingness to hire the employee-plaintiff is strong evidence that the employer is not biased against the protected class to which the employee belongs"); *Buhrmaster v. Overnite Transp. Co.*, 61 F.3d 461, 464 (6th Cir.1995) ("An individual who is willing to hire and promote a person of a certain class is unlikely to fire them simply because they are a member of that class"). Brooks hired Day in June 2009,[56] and, less than a year and a half later, along with Fowler, Brooks decided to terminate her.[57] A period of a year and a half qualifies as a "short period of time." See *Coleman v.*

---

53. MSJ at 11.

54. Opp. at 2, 23.

55. MSJ at 11.

56. Brooks Decl., ¶ 3.

57. *Id.*, ¶¶ 8, 9.

*Quaker Oats Co.*, 232 F.3d 1271, 1286 (9th Cir.2000) (taking the same-actor inference into account where a manager created a new position for an employee more than a year prior to his layoff); *Schnabel v. Abramson*, 232 F.3d 83, 91 (2d Cir.2000) (affirming summary judgment in an employment discrimination case based in part on the fact that the plaintiff "was fired by the same man who had hired him three years earlier"). There is thus a strong inference that Brooks decision to terminate Day was not based on her gender.

This inference can be overcome, however, if Day provides "meaningful evidence that her supervisor harbored discriminatory animus," *Johnson v. Boys and Girls Clubs of South Puget Sound,* 191 Fed. Appx. 541, 545 (9th Cir.2006) (Unpub. Disp.), or "evidence suggesting that [the defendants] developed a bias against [the protected class]" during the interval between the hiring and firing decisions, *Coghlan,* 413 F.3d at 1097.[58] At her deposition, Day admitted that she did not believe she was ever denied promotions or benefits due to her gender;[59] that no one made gender-based statements in her presence that she felt were inappropriate;[60] and, that she never received any documents or writings that contained derogatory statements about her gender.[61] Her primary evidence of discriminatory animus is evidence that defendants fostered a "boys' club" atmosphere, where men were generally treated more favorably than women.

█ Although she does not expressly say so, Day appears to rely on a disparate treatment theory to show that defendants acted with discriminatory intent. "Disparate treatment occurs when a plaintiff is singled out on account of her race or another protected characteristic and is treated less favorably than others similarly situated." *Lelaind v. City and County of San Francisco,* 576 F.Supp.2d 1079, 1091 (N.D.Cal.2008) (citing *Cornwell v. Electra Central Credit Union,* 439 F.3d 1018, 1028 (9th Cir.2006)); see also *Twymon v. Wells Fargo & Co.,* 462 F.3d 925, 936 (8th Cir. 2006) ("Contrasting the treatment of similarly situated employees outside of the protected class with the employee's treatment is one way to point towards a race-based motivation"); *McGuinness v. Lincoln Hall,* 263 F.3d 49, 53 (2d Cir.2001) (in a race discrimination case, "[a] showing that the employer treated a similarly situated employee differently is 'a common and especially effective method' of establishing a prima facie case of discrimination"); *Solano v. Regents of University of California,* No. S–04–0357 FCD/PAN, 2005 WL 1984473, *4 (E.D.Cal. Aug. 15, 2005) ("To establish a prima facie case of race discrimination, plaintiff must prove ... the employer treated similarly situated individuals who are not in her protected class more favorably").

█ In employment discrimination cases, employees are similarly situated to a plaintiff if they perform similar work responsibilities or are guilty of similar misconduct. See *Meaux v. Northwest Airlines, Inc.,* 718 F.Supp.2d 1081, 1090–91 (N.D.Cal.2010) ("Plaintiff also argues that he was treated differently than a similarly situated Caucasian flight attendant to whom the Court will refer as Doe. However, Plaintiff's and Doe's conduct are not comparable.... Doe did not threaten the passenger or write to his employer. When discussing the incident with his supervisor, Doe acknowledged fault, whereas Plaintiff

---

**58.** Opp. at 2, 23.

**59.** Parker Decl., Exh. 1 ("Day Depo.") at 120:23–121:8.

**60.** Day Depo. at 121:24–122:9.

**61.** Day Depo. at 122:10–24.

failed to accept any responsibility for his conduct"); *Solano*, 2005 WL 1984473 at *4 ("[P]laintiff has established a prima facie claim of disparate treatment between herself and others similarly situated. Specifically, Solano produced evidence that no other employees have been subject to comparably severe discipline for similar misconduct. She identified non-Latina employees in the Accounting and Financial Services department who submitted fraudulent travel vouchers to the University and were not subject to any discipline"); *Smith v. Safeway Corp.*, No. C 98–3277 SI, 1999 WL 778202, *4 (N.D.Cal. Sept. 27, 1999) ("Smith[, a white female,] argues that some employees were terminated while others were suspended or given written warnings. Smith points to employees Andy Yee and Gary Puno, both Asian American men, who were not terminated by Safeway. However, Smith fails to note that Safeway's investigator concluded that Yee and Puno had not engaged in the type of consistent violations of store policy than Smith had, and she has failed to produce evidence to the contrary. She also does not acknowledge that three additional employees who were investigated, but not terminated, were white (males). More importantly, Smith fails to note that the two other employees ... who were terminated with her, and for the same reason, are black/Latino male and white male, respectively. These facts are inconsistent with Smith's claim that she was disciplined differently than similarly situated employees solely because of her sex or race").

Courts "require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir.1999)

■ Day asserts that, during the course of the Grant investigation, male employees also breached the policy regarding the confidentiality of company investigations, but faced no adverse employment action as a result. She contends that she, by contrast, was terminated for such conduct.[62] Specifically, she asserts that Rea breached the company's confidentiality policy by disclosing to Grant that there had been a complaint about him.[63] Grant testified that Rea told him during his annual review that there had been general complaints regarding Grant's professionalism.[64] He stated, however, that Rea did not "discuss the incident" that led to the complaint or provide details; he also did not tell Grant that Wold was the complainant.[65] Rather, Rea simply advised Grant, as part of his annual review of Grant's job performance, that there was a perception that Grant's "work hard, play hard" attitude had become a "play hard, play hard attitude." [66] The fact that Rea, Grant's supervisor, discussed the complaint with Grant in general terms as part of an overall review of Grant's job performance is not equivalent to Day's discussion with Lawless, which specifically referenced a formal complaint and occurred after Day had been advised

---

**62.** Opp. at 11–13.

**63.** *Id.*

**64.** Grant Depo. at 271:17–272:7; 283:16–19 (Q: Is it still your testimony that Vance Rea never told you that Gregg Wold was the source of the complaint against you in regard[ ] to the Seattle trip? A: Yes").

**65.** *Id.* The record reflects that after Grant's annual review, he emailed Rea to follow up

on the complaint that had been made against him. Rea responded: "At this time I cannot discuss it with you." (Yun Decl., Exh. 38). This bolsters defendants' argument that Rea did not disclose specific details regarding the complaint and did not breach the company's confidentiality policy.

**66.** *Id.* at 271: 7–11.

to keep the fact that a complaint had been made confidential. As a result, Rea's conduct is not sufficiently comparable to Day's to warrant the conclusion that he and she were similarly situated.[67]

■ Day also asserts that after she shared her concerns about Rea with Lawless, Brooks instructed Lawless to inform Rea of Day's remarks.[68] Day cites Lawless' deposition, in which Lawless stated that Brooks told her to inform Rea about her conversation with Day.[69] Day contends that Brooks breached the company's confidentiality policy by directing Lawless to speak with Rea, and that defendants' failure to discipline Brooks for this breach establishes disparate treatment sufficient to establish a *prima facie* case. As is the case with Rea's purported breach, however, the court cannot find that Brooks is similarly situated to Day for purposes of establishing a *prima facie* case of discrimination. Brooks is the president of Sears Outlet and was Day's supervisor during her tenure there. Generally, a supervisor and a lower-level employee are not similarly situated. See *Vasquez*, 349 F.3d at 641 ("[I]ndividuals are similarly situated when they have similar jobs and display similar conduct.... Employees in supervisory positions are generally deemed not to be similarly situated to lower level employees"); see also *Lopez v. Potter*, 370 Fed. Appx. 840, 841 (9th Cir.2010) (Unpub. Disp.) (plaintiff failed to establish a *prima facie* case of discrimination by comparing himself to his superiors because the "managers were not similarly situated to Lopez"); *Jones v. Denver Post Corp.*, 203 F.3d 748, 753 (10th Cir.2000) ("Canino was one of Jones's supervisors and therefore cannot be deemed similarly situated in a disciplinary matter such as this one"). Brooks' uncontroverted testimony establishes that as Sears Outlet's president, it was his responsibility to stay informed regarding investigations of upper level employees like Day.[70] He asserts that it was in this capacity that he discussed Day's purported breach with Lawless, and directed that she involve Rea to determine whether human resources should be notified of Day's conduct.[71] Because Brooks played a significantly different role in the company than Day, the fact that he told Lawless to speak with Rea is not comparable to Day's alleged breach.

Moreover, even if he was not a supervisor, Brooks' purported conduct is not sufficiently similar to Day's that defendants' failure to discipline Brooks constitutes evidence of disparate treatment. Day alleg-

---

67. At the hearing, Day reiterated her argument that Rea had breached confidentiality, and that the breach was "swept under the rug" by defendants. She did not, however, cite further evidence showing that Rea's general comment during Grant's annual review was sufficiently equivalent to her reference to an ongoing formal investigation that defendants' failure to discipline Rea supports an inference of gender discrimination. Had defendants concluded that Rea breached confidentiality and failed to take disciplinary action, Day's argument might have persuasive force. Based on the record before the court, however, the circumstances of the two situations are too different to give rise to an inference that Rea breached the company's confidentiality policy in a manner similar to Day.

68. Opp. at 12.

69. Lawless Depo. at 135:9–15

70. Brooks Decl., ¶ 6.

71. *Id.* Although Rea was not a human resources employee, it was his responsibility as sales director to conduct an initial investigation of complaints about his employees to determine whether they merit a formal human resources investigation. (Rea Decl., ¶ 5). Rea testified that it was in his "capacity as National Sales Director, and because it involved a senior member of [his] team who was [his] direct report, [that he] was kept informed of the subsequent investigation into [Day's] breach of company policies." (Rea Decl., ¶ 12).

edly discussed a formal human resources investigation with Lawless; there is no evidence that Lawless was a human resources employee or tasked with conducting informal investigations prior to involving human resources. Rather, it appears that Lawless was completely removed from the Grant investigation until Day spoke with her about it. By contrast, Brooks told Lawless to advise Rea of Day's complaint because Brooks was concerned that Day had breached company policy and, as Day's direct supervisor, Rea was tasked with conducting an initial informal investigation regarding possible misconduct.[72] In essence, Brooks directed Lawless to bring Day's comments to Rea's attention so that Rea could determine whether a *new* human resources investigation ought to be opened. It is therefore not clear that Brooks' direction to Lawless to speak with Rea was a breach of company policy or sufficiently similar to Day's conduct to warrant an inference of discriminatory treatment. As a consequence, Day has failed to show that Brooks "engaged in the same conduct as [Day] without any mitigating or distinguishing circumstances." *Wills v. Superior Court*, 195 Cal.App.4th 143, 173, 125 Cal.Rptr.3d 1 (2011).

Ultimately, even if Brooks did violate defendants' confidentiality policy, he was not similarly situated to Day, because he was an upper level manager while Day was a regional sales director, and their conduct was not sufficiently similar. Defendants' failure to discipline him, therefore, does not give rise to a reasonable inference of gender discrimination. *Ching v. Warner Bros. Studio Facilities, Inc.*, No. B220924, 2011 WL 2936535, *6 (Cal.App. July 20, 2011) (Unpub. Disp.) ("Ching then claims that another employee who violated the confidentiality rule was not terminated or disciplined, but he has not shown that he was similarly situated to that employee"). Accordingly, Day cannot establish a *prima facie* case of gender discrimination on the basis of defendants' treatment of Brooks.

 Day also argues that similarly situated male employees impeded human resources investigations and lied during formal investigations.[73] First, she claims that Grant, Calderwood, and Rea impeded the Grant investigation by failing to disclose material information, including emails they received from Grant regarding drinking, women, and domestic violence.[74] Jemo's deposition testimony appears to confirm that these emails were not shared with human resources during the Grant investigation.[75] Day further asserts that Grant lied about his excessive drinking and lewd comments when interviewed by Jemo, but faced no consequences for his dishonesty.[76]

 The actions of Grant, Calderwood, and Rea are distinguishable from the conduct that led to Day's termination. Defen-

---

**72.** Brooks Decl., ¶ 6; Rea Decl., ¶¶ 5, 12.

**73.** Opp. at 13. See also Yun. Decl., Exhs. 40–44. As noted, Day contends that initially the only explanation given for her termination was her purported breach of confidentiality regarding the human resources investigation. Defendants, however, assert that Day was terminated for lying during the course of an investigation and impeding an investigation. (Brooks Decl., ¶¶ 7–8; Fowler Decl., ¶¶ 7–8). The differing explanations are addressed below. Because defendants rely on these additional explanations, however, the court con-

siders, in evaluating whether Day has raised triable issues concerning disparate treatment of similarly situated individuals as part of her *prima facie* case, the evidence she proffers that male employees also lied and/or impeded investigations but were not disciplined.

**74.** *Id.* at 13. See also Yun. Decl., Exhs. 40–44.

**75.** Exhibit List, Exh. G ("Jemo Depo.") at 343:10–345:4; 354:11–18.

**76.** Opp. at 12–13.

dants purportedly terminated Day for lying in response to specific questions put to her as to whether she had discussed the Grant investigation with anyone.[77] This is different than failing to disclose emails, particularly because there is no evidence that Jemo specifically asked for the documentation that was withheld. Although he stated that he would likely have asked the employees he interviewed, including Grant, Calderwood, and Rea, to provide any documentation in their possession relevant to the investigation, Jemo testified during his person-most-knowledgeable deposition that he does not specifically recall asking for emails relevant to the complaints against Grant.[78] Additionally, while Day argues that Grant lied to Jemo during the course of the investigation into his conduct, she adduces no evidence that he was dishonest during his interview with Jemo. In fact, Jemo testified at his deposition that he believed Grant was *truthful* during his interview; defendants, moreover, never accused Grant of dishonesty.[79] See *Safeway Corp.*, 1999 WL 778202, at *4 ("Smith[, a white female,] argues that some employees were terminated while others were suspended or given written warnings. Smith points to employees Andy Yee and Gary Puno, both Asian American men, who were not terminated by Safeway. However, Smith fails to note that Safeway's investigator concluded that Yee and Puno had not engaged in the type of consistent violations of store policy than Smith had, and she has failed to produce evidence to the contrary"); compare *Ezell v. Edwards Theatres, Inc.*, No. 104–CV–6533–SMS, 2006 WL 3782698, *17 (E.D.Cal. Dec. 21, 2006) ("Leist was sufficiently similarly situated with Plaintiffs because *she was accused of having engaged in conduct that warranted expulsion*, but she was not subjected to the same humiliating treatment as Plaintiffs, was not subjected to questioning or an investigation with respect to the alleged wrongful conduct, was not ejected, and was supported by Defendants' manager, who sought out witnesses in her behalf and obtained statements" (emphasis added)). Jemo also stated that during his interview, Grant did not deny making derogatory remarks, and stated only that he did not *recall* making them.[80] Finally, defendants adduce evidence that they have, in the past, terminated male employees for dishonesty.[81] There is thus no evidence that defendants treated similarly-situated

77. MSJ at 13.

78. Exhibit List, Exh. D ("PMK Depo."), at 314:14–24 (:Q: Beyond interviewing the witnesses that you spoke with, did you ask them to provide you with any documentation other than their own statements in connection with the investigation you made into Neva Day's complaints about Mark Grant? A: If there was any documentation that would have been pertinent to the investigation, I would have. I don't believe there was anything that anyone brought up that I asked for specifically").

79. Jemo Depo. at 303:13–310:12.

80. *Id.* at 256:23–257:5 ("How did Mark Grant look when he told you that he didn't make a comment about pushing his wife off a cliff to Jessica Boehm? A: I don't think Mark Grant stated that he did not make the comment. I believe he stated he did not recall making the comment. He did not deny making that comment").

81. Brooks Decl., ¶ 7 ("The company has terminated other male and female employees for similar ethics violations, and I am aware that prior to Plaintiff's termination, a male Regional Sales Director for Sears Outlet Stores, L.L.C. had been terminated for dishonesty"); Fowler Decl., ¶ 7 ("Truthfulness of witnesses in conducting Human Resources and other company investigations is of paramount importance, since important employment decisions are based on the witnesses' statements. Dishonesty in a Human Resources investigation is regarded as an ethics violation. The company has terminated other male and female employees for similar ethics violations").

individuals outside Day's protected class more favorably.

Ultimately, while Jemo and others at Sears Outlet concluded that Day had lied during her investigation, they did not find that Grant, Calderwood or Rea had been dishonest. As a consequence, it cannot be said that these employees engaged in misconduct similar to that with which Day was charged. They are not, as a result, similarly situated for the purposes of establishing a *prima facie* case. See *Meaux*, 718 F.Supp.2d at 1090–91 (employees were not similarly situated because "Plaintiff's and Doe's conduct [was] not comparable"). Rather, Day wishes to have the court compare "apples with oranges." *Maniccia*, 171 F.3d at 1368. Moreover, at least one male regional sales director—the same position held by Day—had earlier been terminated for similar dishonesty. See *Snead v. Metropolitan Property & Cas. Ins. Co.*, 237 F.3d 1080, 1094 (9th Cir.2001) (concluding, in the context of determining pretext, that a showing that "at least one other similarly situated employee ... was treated in a similar manner as [plaintiff]" negated a showing of discriminatory intent).[82] Accordingly, defendants' retention of Grant, Calderwood and Rea does not give rise to an inference of discriminatory animus.

The court notes, finally, that, even if the individual incidents Day cites in fact violated company policy or constituted wrongful conduct, she has proffered no evidence that a similarly situated employee engaged in all three forms of alleged wrongdoing— i.e., breached confidentiality, impeded an investigation, and lied during an investigation—without disciplinary action.[83] For

---

**82.** At the hearing, Day noted that Aimee Kaufman, a former employee of Sears Outlet, was found to have breached confidentiality but was not terminated as a result. Kaufmann, however, is a female. The fact that another female employee did not suffer termination as a result of breaching confidentiality does not support an argument that defendants acted with discriminatory animus toward Day due to her gender. If anything, it weakens any inference of discriminatory animus that could be drawn. While evidence that an employee in the same protected class was treated differentially and better than plaintiff does not automatically defeat a claim of discrimination, neither does it *support* a finding of discrimination. See *Diaz v. American Telephone & Telegraph*, 752 F.2d 1356, 1362 (9th Cir.1985) ("The fact that AT & T eventually promoted a Mexican–American to the position that Diaz sought, after Diaz filed his state discrimination claim, does not *automatically* remove the presumption of discrimination created by this other evidence" (emphasis added)).

**83.** While defendants initially told Day that she was being terminated for breaching confidentiality, they now contend that she was terminated not only because of that, but also because she impeded an investigation and lied during the course of an investigation. While evidence on a motion for summary judgment must be viewed in the light most favorable to the non-moving party, Day has proffered no evidence controverting the fact that defendants considered all three types of misconduct in deciding to terminate her. Her evidence shows only that she was not *told* of the role her lies and impeding of the investigation played in the termination decision until after litigation began. Other courts have permitted employers to introduce additional, previously undisclosed explanations for a termination decision at the summary judgment phase of a case. See *Stegall v. Citadel Broadcasting Co.*, 350 F.3d 1061, 1068 (9th Cir.2003) (although "[a]t the time it terminated her, Marathon's management stated that it was due to changes that were being made to KORD," the court considered the fact that "after Stegall commenced this lawsuit, Marathon's managers also stated that she was terminated because she had a negative attitude about her job"); *Merrick v. Farmers Ins. Group*, 892 F.2d 1434, 1438 (9th Cir.1990) ("Merrick argues that Farmers' reasons for not promoting him lack credibility, because these reasons were not documented until after the commencement of Merrick's suit. We disagree. That Raney waited to memorialize the reasons for his decision fails to implicate the reasons themselves. Clearly, Raney documented his reasons in response to Merrick's discrimination suit. But, as the district court noted this is not unusual"); *Zapata–Matos v. Reckitt & Colman, Inc.*, 277 F.3d 40, 47 (1st Cir.2002)

example, although Day asserts that Rea breached confidentiality by discussing her complaint with Grant, she proffers no evidence that he also lied during an investigation of his purported breach. Similarly, even if Brooks breached confidentiality by instructing Lawless to contact Rea, there is no evidence that he also impeded an investigation or lied to human resources officials. Thus, even if the evidence Day proffers concerning Grant's, Rea's, and Brooks' actions supported a conclusion that they had engaged in misconduct similar to one of the offenses committed by Day, there is no evidence that any male employee breached confidentiality, impeded an investigation, *and* lied during an investigation, without being subjected to discipline. As a result, the severity of any wrongdoing in which these male employees engaged is not comparable to Day's alleged misconduct, and the court cannot conclude that the evidence raises triable issues of fact as to whether defendants treated similarly situated employees outside Day's protected class more favorably.

■ For the reasons stated, the court concludes that Day has not overcome the inference of nondiscrimination that arises from the fact that the same individual hired and fired her within a relatively short period. Day has adduced no evidence that causally links her termination to her protected status. Moreover, she has proffered no evidence that similarly situated employees outside her protected class were treated more favorably; there is no evidence in the record of similarly situated male employees breaching confidentiality, in the manner Day purportedly did. Additionally, the only evidence concerning other employees accused of dishonesty is Brooks' declaration that he previously terminated male employees for lying. Day adduces no evidence regarding other employees accused of impeding an investigation. Most significantly, she has proffered no evidence that a similarly situated employee outside her protected class engaged in all three forms of misconduct without being disciplined. Thus, Day has failed to establish a *prima facie* case of gender discrimination.[84]

(considering additional "explanations that the managers involved gave at their depositions for terminating Zapata" because the explanations were "consistent and not contradicted by either contemporaneous documents or statements made at termination, or statements made later"). As Day has adduced no evidence controverting Brooks' and Fowler's testimony that in deciding to terminate Day, they considered not only her breach of confidentiality but also the fact that she had lied and impeded an investigation, the court will consider defendants' proffered explanation that Day was terminated for breaching confidentiality, impeding an investigation, and lying during an investigation, as the explanation is consistent with, and not contradicted by, contemporaneous information concerning the termination decision. The fact that additional explanations were proffered after the commencement of litigation began may, however, be evidence of pretext; this issue is discussed below.

**84.** At the hearing, Day argued for the first time that male employees who complained

about sexual harassment did not suffer retaliation, while female employees who lodged such complaints were terminated. Specifically, Day argued that Ben Komadina, a regional sales director for defendants, complained to Rea about Grant's behavior but was not subjected to discipline. Day asserted this was evidence of defendants' animus against female employees. Day's argument is unavailing. First, there is no admissible evidence in the record that Komadina complained about Grant's behavior. The sole reference to Komadina's alleged complaint is found in Day's declaration, which states that "male employees, including Ben Komadina, also complained to Rea [about Grant] and were not treated as complainers." (Day Decl., ¶ 33.) Defendants object to this evidence on the grounds that it lacks foundation. (Objections at 8.) Defendants' objection is well-taken.

Under Rule 602 of the Federal Rules of Evidence, "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Day's

### 3. Defendants' Nondiscriminatory Reason for the Adverse Employment Action

■ Even if the court assumes that Day's evidence is sufficient to establish a *prima facie* case of gender discrimination, defendants have articulated a legitimate, non-discriminatory reason for discharging her. To satisfy their burden of production on this issue, defendants "need not persuade the court that [they were] actually motivated by the proffered reasons. It is sufficient if the[ir] ... evidence raises a genuine issue of fact as to whether [they] discriminated against the plaintiff. To accomplish this, the defendant[s] must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's [dismissal]." *Burdine*, 450 U.S. at 255, 101 S.Ct. 1089.

■ Under FEHA, defendant's true reasons, "if nondiscriminatory, ... need not necessarily have been wise or correct ... While the objective soundness of an employer's proffered reasons supports their credibility, the ultimate issue is simply whether the employer acted with *a motive to discriminate illegally*. Thus, 'legitimate' reasons ... in this context are reasons that are *facially unrelated to prohibited bias*, and which, if true, would thus prohibit a finding *of discrimination*." *Guz*, 24 Cal.4th at 358, 100 Cal.Rptr.2d 352, 8 P.3d 1089 (emphasis original).

■ Defendants assert that Day was terminated for violating company policy that required that employees maintain the confidentiality of company investigations and for lying to investigators during an interview regarding her complaint against

declaration contains no facts indicating that she knows personally that Komadina complained to Rea. She provide no details concerning the complaint—e.g., when it was made or the form it took—that might suggest personal knowledge. Nor does she adduce evidence that Komadina or defendants informed her of the complaint. There is simply no direct or circumstantial evidence in the record that indicates Day has personal knowledge of Komadina's purported complaint to Rea. See *Cuc Dang v. Sutter's Place, Inc.*, No. C–10–02181 RMW, 2012 WL 2977223, *4 (N.D.Cal. July 19, 2012) (excluding an unsupported statement that " 'I am aware of other employees also complaining ... but nothing was done' " under Rule 602); *Hill v. Southeastern Freight Lines, Inc.*, 877 F.Supp.2d 375, 383 (M.D.N.C.2012) (excluding an unsupported statement that "[s]ome other employees, such as Joe Hollifield and Joe McPherson, did refuse assignments, but there were no adverse consequences to them for refusing assignments" under Rule 602); *Quaranta v. Management Support*, 255 F.Supp.2d 1040, 1050 (D.Ariz.2003) (excluding evidence that another employee was subjected to discrimination for taking maternity leave because plaintiff "had no personal knowledge of the amount of Arnold's leave time or whether she exceeded her limit under company policy," and con-

cluding that the other employee was not similarly situated as a result). The court therefore sustains defendants' objection to Day's testimony regarding Komadina's complaint.

Second, as noted, Day failed to make this argument regarding Komadina in her opposition. "Failure to raise issues in opposition to summary judgment functions as a waiver" of the argument. *Reliance Ins. Co. v. Doctors Co.*, 299 F.Supp.2d 1131, 1154 (D.Haw.2003). By omitting the argument concerning Komadina, Day deprived defendants of an opportunity to respond. The court therefore declines to consider the argument, which was raised for the first time at the hearing. See *Cataphora Inc. v. Parker*, No. C09–5749 BZ, 2012 WL 13657, *3 n. 6 (N.D.Cal. Jan. 4, 2012) ("Inasmuch as this argument was raised for the first time during the hearing and is not mentioned in Defendants' opposition, I decline to consider it"); *In re Apple Inc. Securities Litigation*, No. 5:06–CV–05208–JF, 2011 WL 1877988, *5 n. 6 (N.D.Cal. May 17, 2011) ("The Court is not inclined to consider this argument given that it was not briefed but rather was raised for the first time at the end of the hearing"); *White v. FedEx Corp.*, No. C04–00099 SI, 2006 WL 618591, *2 (N.D.Cal. Mar. 13, 2006) ("The Court will not consider any arguments or evidence raised for the first time at the hearing").

Grant.[85] Defendants assert that they have adopted a company policy that "Human Resources investigations are confidential, due to the sensitive and often private nature of such investigations."[86] They also maintain that another company policy requires employees to cooperate with human resources investigations.[87] Several courts have recognized that violation of company policies is a legitimate, nondiscriminatory reason for terminating an employee. See, e.g., *Dumas v. New United Motor Mfg., Inc.*, 305 Fed.Appx. 445, 448 (9th Cir.2008) (Unpub. Disp.) ("NUMMI proffered a legitimate, non-discriminatory reason for terminating Mr. Dumas—his violation of company policy"); *Elmore v. New Albertson's, Inc.*, No. CV 11–04802–ODW (JCx), 2012 WL 3542537, *4 (C.D.Cal. Aug. 15, 2012) ("Albertson's has provided a legitimate, nondiscriminatory reason for Elmore's termination. Specifically, Elmore violated Albertson's company policy through her conduct"); *Rezentes v. Sears, Roebuck & Co.*, 729 F.Supp.2d 1197, 1205 (D.Haw.2010) ("Sears may have 'honestly believed' that Rezentes violated company policy and then lied about her actions. Firing an employee because of honesty and integrity concerns is a legitimate, nondiscriminatory reason for a termination"). Day, moreover, does not dispute that violation of company policies is a legitimate, nondiscriminatory basis for terminating an employee.[88] Thus, even had Day made out a *prima facie* case of gender discrimination, defendants have proffered sufficient evidence to demonstrate a legitimate, nondiscriminatory reason for terminating her,

and the burden shifts to Day to raise triable issues of fact regarding pretext.

### 4. Whether Day Has Raised Triable Issues of Fact Concerning the Pretextual Nature of Defendants' Explanation

To show that defendants' articulated reason for termination was not the true reason, Day "may succeed ... either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S.Ct. 1089. See also *Chuang v. University of California Davis*, 225 F.3d 1115, 1127 (9th Cir.2000) ("We have stated that a plaintiff can prove pretext in two ways: (1) indirectly, by showing that the employer's proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer"); *Nidds*, 113 F.3d at 918 (to satisfy her burden and survive summary judgment, plaintiff "must produce enough evidence to allow a reasonable factfinder to conclude either: (a) that the alleged reason for [the] discharge was false, or (b) that the true reason for his discharge was a discriminatory one"); *Warren v. City of Carlsbad*, 58 F.3d 439, 443 (9th Cir.1995) (stating that plaintiff "must produce evidence of facts that either show a discriminatory motive or show that the [employer's] explanation for his rejection is not

---

**85.** MSJ at 13.

**86.** Jemo Decl., ¶ 16.

**87.** *Id.*, ¶ 13.

**88.** As noted, Day contends that the only explanation defendants gave for her termination was her purported breach of confidentiality, and that it was not until after she had com-

menced this action that defendants asserted that she had been dishones and had impeded the Grant investigation. A breach of even one company policy, however, can be a legitimate, nondiscriminatory basis for termination. See, e.g., *Dumas*, 305 Fed.Appx. at 448 (affirming the termination of an employee for breach of a single company policy requiring written permission for extended leaves of absence).

credible"). Day "may rely on the same evidence [she] used to establish a *prima facie* case or put forth additional evidence." *Coleman,* 232 F.3d at 1282.

██ "[C]ircumstantial evidence that tends to show that the employer's proffered motives were not the actual motives 'must be "specific" and "substantial" in order to create a triable issue with respect to whether the employer intended to discriminate....' " *Blue v. Widnall,* 162 F.3d 541, 546 (9th Cir.1998) (quoting *Godwin v. Hunt Wesson, Inc.,* 150 F.3d 1217, 1222 (9th Cir.1998)). See also *Wallis,* 26 F.3d at 890 ("In response to the defendant's offer of nondiscriminatory reasons, the plaintiff must produce 'specific, substantial evidence of pretext,' " quoting *Steckl v. Motorola, Inc.,* 703 F.2d 392, 393 (9th Cir.1983)).

██ Stated differently, an employee offering circumstantial evidence to show pretext must proffer "substantial evidence" that "the employer's stated reason for the adverse action was untrue or pretextual, or evidence that the employer acted with a discriminatory animus, or a combination of the two, such that a reasonable trier of fact could conclude that the employer engaged in intentional discrimination." *Morgan v. Regents of the University of California,* 88 Cal.App.4th 52, 75, 105 Cal.Rptr.2d 652 (2000) (quoting *Horn v. Cushman & Wakefield Western, Inc.,* 72 Cal.App.4th 798, 806–07, 85 Cal.Rptr.2d 459 (1999) (internal quotation marks omitted)). "An employee in this situation cannot simply show the employer's decision was wrong, mistaken, or unwise. Rather, the employee must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, ... and hence infer that the employer did not act for the [... asserted] non-discriminatory reasons." *Id.* (quoting *Horn,* 72 Cal.App.4th at 807, 85 Cal. Rptr.2d 459 (internal quotation marks omitted)). Where a plaintiff presents direct evidence that the proffered explanation is a pretext for discrimination, however, "very little evidence" is required to avoid summary judgment. *E.E.O.C. v. Boeing Co.,* 577 F.3d 1044, 1049 (9th Cir. 2009).

Day has adduced no direct evidence of gender discrimination. As noted, Day testified that she did not believe she was ever denied a promotion or benefits due to her gender;[89] that no one made gender-based statements in her presence that she felt were inappropriate;[90] and that she never received any documents or writings that contained derogatory statements about her gender.[91] Rather, Day relies on circumstantial evidence to support her claim of pretext. First, she argues that statistical evidence supports an inference that defendants have discriminatory animus toward women class.[92] When Day was hired, five of sixteen national, regional, and district level field sales positions were held by women;[93] by the time she was discharged, only one of the sixteen positions was filled by a woman.[94] Day contends that the small number of positions held by women, and the fact that they decreased over time shows that defendants engaged in a pattern of discriminatory conduct.[95]

**89.** Day Depo. at 120:23–121:8.

**90.** Day Depo. at 121:24–122:9.

**91.** Day Depo. at 122:10–24.

**92.** Opp. at 24–25.

**93.** Yun Decl., Exh. 19.

**94.** Exhibit List, Exh. C ("Brooks Depo.") at 190:17–191:21.

**95.** Opp. at 24–25.

 Statistical evidence is a form of indirect evidence that "may tend to show pretext." *Carden v. Chenega Sec. & Protection Services, LLC,* No. CIV. 2:09–1799 WBS CMK, 2011 WL 1807384, *6 (E.D.Cal. May 10, 2011). The utility of statistics, however, "depends on all the surrounding facts and circumstances." *Sengupta v. Morrison–Knudsen Co., Inc.,* 804 F.2d 1072, 1075 (9th Cir.1986). In *Sengupta,* the court declined to consider a plaintiff's evidence that four of five employees laid off in a pool of 28 employees were African American. *Id.* It noted that "statistical evidence derived from an extremely small universe ... has little predictive value and must be disregarded." *Id.* at 1076 (internal quotation marks omitted). See also *Aragon v. Republic Silver State Disposal Inc.,* 292 F.3d 654, 663 (9th Cir.2002) ("[T]he fact that three of the four casuals singled out for lay off that night were white could constitute circumstantial evidence of discrimination demonstrating pretext.... Yet, because the sample size is so small, we decline to give it much weight"). Furthermore, to demonstrate pretext, statistics "must show a stark pattern of discrimination unexplainable on grounds other than [gender]." *Coleman,* 232 F.3d at 1283.

 Day's statistical evidence concerning a pool of sixteen employees is too small to constitute "substantial and specific" evidence that defendants' proffered reasons for terminating her are pretextual. See *Diaz v. Eagle Produce Ltd. Partnership,* 521 F.3d 1201, 1209 (9th Cir.2008) (holding that "two data sets of sixteen workers are too small to form a reliable basis for analysis"). Moreover, the fact that the number of field sales positions

held by women declined from five to one is insufficient, by itself, to demonstrate pretext. See *Palmer v. United States,* 794 F.2d 534, 539 (9th Cir.1986) ("Plaintiff's simple proof that the age of employees declined over time is patently insufficient; he has not demonstrated any relationship between the challenged agency actions and the decline in ages with regard to the pool of employees eligible to be affected by the disputed agency actions"). Rather, statistical evidence must also "account for possible nondiscriminatory variables, such as job performance." *Aragon,* 292 F.3d at 663. Day has adduced insufficient evidence to show that the three female employees who were no longer employed at the time she was terminated lost their jobs due to gender discrimination. Defendants, moreover, proffer evidence that two of the other three women who left the company resigned,[96] and Penny Parker, the only other woman discharged, had been placed on a performance improvement plan and was eventually terminated for poor performance.[97] Day has adduced no contradictory evidence.

 Additionally, Day has not demonstrated that the pool of sixteen field sales positions is the relevant one on which to assess discriminatory motive. See *Sengupta,* 804 F.2d at 1075–76 ("Sengupta's ability to prove discriminatory intent based on statistical evidence depends upon selecting the proper labor pool. The issue is whether that pool is the entire Mining Group or Department 222"). The Ninth Circuit has stated that the "impact of a practice on the protected class should generally be measured against the actual pool of employees affected by that practice."

---

96. Supplemental Declaration of Alden Parker ("Supp. Parker Decl."), Docket No. 45 (Nov. 5, 2012), Exh. 22 ("Supp. Kaufman Depo.") at 127:21–23; Supp. Parker Decl., Exh. 21 ("Supp. Jemo Depo.") at 80:2–9.

97. Supp. Parker Decl., Exh. 19 ("Parker Depo.") at 213:4–214:19; Supp. Parker Decl., Exh. 28 ("Supp. Jemo Decl."), ¶ 3.

*Id.* Defendants have adduced evidence that the pool of 16 workers identified by Day represents only national, regional, and district sales positions in the field; it excludes equivalent positions in defendants' home office.[98] Day's argument is that Brooks and other upper-level managers have fostered a "boys' club" atmosphere throughout the company; she does not limit the contention to field workers.[99] As a result, there is no reason artificially to shrink the pool of relevant employees and statistical evidence. See *id.* ("By necessity, courts sometimes must rely on statistics derived from small sample groups. Not to do so would deny employees in small companies some of the protections that Title VII provides. M–K is not, however, a small company; nor is the Mining Group a small group. There exists no necessity to employ a small group").

Given the unrepresentative and unnecessarily small sample size Day used, and her failure to take into account possible non-discriminatory variables, Day's statistical evidence is not sufficient to carry her burden of adducing "specific, substantial evidence of pretext." *Wallis,* 26 F.3d at 890.

▬▬▬▬ Day next argues that the fact that defendants changed their explanation for terminating her demonstrates pretext. Day asserts that defendants initially stated she was being terminated for breaching confidentiality, but later claimed that she had also been terminated for lying during an investigation and impeding an investigation.[100] However, only *"substantial changes* over time in the employer's proffered reason for its employment decision support a finding of pretext." *Sanchez v. Corrections Corp. of America,* No. CV F 06–0152 AWI DLB, 2007 WL 1390675, *12 (E.D.Cal. May 9, 2007) (emphasis in original). See also *Washington v. Garrett,* 10

F.3d 1421, 1434 (9th Cir.1993) ("[I]n the ordinary case, *such fundamentally different justifications* for an employer's action would give rise to a genuine issue of fact with respect to pretext since they suggest the possibility that neither of the official reasons was the true reason" (emphasis added)). A court cannot "infer pretext from the simple fact that [defendants] had two different, although consistent, reasons for laying off" an employee. *Aragon,* 292 F.3d at 661. The proffered explanations for Day's termination are consistent; all pertain to her conduct during the Grant investigation. There is nothing inconsistent about terminating Day for breaching the confidentiality of an investigation and for lying about the breach. Moreover, the fact that defendants articulated additional, consistent explanations for Day's discharge after the termination decision was made is not evidence of pretext. See *Smith v. Oklahoma ex rel. Tulsa County Dist. Attorney,* 245 Fed.Appx. 807, 816 (10th Cir. 2007) (Unpub. Disp.) ("Here, we agree with the district court that the explanations offered for Ms. Smith's discharge are not part of a long line of 'new' reasons but an increasingly detailed explanation for the reasons articulated"); *Lindahl v. Air France,* 930 F.2d 1434, 1438 (9th Cir.1991) ("Simply because [a new] explanation comes after the beginning of litigation does not make it inherently incredible"); *Ekweani v. Ameriprise Financial, Inc.,* No. CV–08–01101–PHX–FJM, 2010 WL 481647 (D.Ariz. Feb. 8, 2010) ("[P]laintiff claims that, because defendant did not offer his qualifications as a reason [for termination] until recently, the shifting nature of defendant's explanations is evidence of pretext. The reasons articulated are plainly consistent. Thus, they are not probative of pretext merely because one came later").

---

**98.** Supp. Jemo Decl., ¶ 4.

**99.** Opp. at 2.

**100.** *Id.* at 21.

Day was notified early in the Grant investigation that Jemo believed she was interfering in a company investigation by not providing the details he requested. Moreover, according to Brooks, he was told that the Grant investigation had been delayed due to Day's failure to provide information requested by Jemo; he states it was this delay that spurred him to direct that Day have a personal interview with Jemo.[101] Accordingly, Day's argument that defendants' various proffered explanations for her termination is evidence of pretext is unavailing.

 Finally, Day argues that the proffered explanation for her termination is false, because she did not breach defendants' confidentiality policy, lie to investigators, or impede the Grant investigation.[102] A plaintiff cannot demonstrate pretext, however, by showing the "employer's decision was wrong, mistaken, or unwise." *Batarse v. Service Employees Intern. Union Local 1000*, 209 Cal.App.4th 820, 834, 147 Cal.Rptr.3d 340 (2012). Rather, she "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Id.* While Day disputes the conclusion that she violated company policy, she has not adduced evidence that the investigation of her conduct was so flawed as to be unworthy of credence. Nor has she adduced evidence suggesting that de-

fendants' conclusion was implausible or incoherent. Thus, even if Day is correct that defendants were wrong, and she did not breach the confidentiality policy, lie to investigators or impede an investigation, this does not show that her termination was motivated by discriminatory animus. See *Guz*, 24 Cal.4th at 361, 100 Cal.Rptr.2d 352, 8 P.3d 1089 ("Proof that the employer's proffered reasons are unworthy of credence may 'considerably assist' a circumstantial case of discrimination, because it suggests the employer had cause to hide its true reasons. Still, there must be evidence supporting a rational inference that *intentional discrimination, on grounds prohibited by the statute, was the true cause* of the employer's actions" (emphasis original)); *Wills v. Superior Court*, 195 Cal.App.4th 143, 160, 125 Cal.Rptr.3d 1 (2011) ("The [employee] cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent"). To raise triable issues of fact regarding pretext, Day must not only show that defendants' conclusion regarding her breach of company policies was wrong, but also adduce evidence that her termination was the result of discriminatory animus. As noted, several individuals testified that they independently concluded Day had breached company policy. For her part, Day failed to proffer sufficient direct or circumstantial evidence that these findings are unworthy of credence, implausible or incoherent.[103] Thus, even if

---

**101.** Brooks Decl., ¶ 5.

**102.** *Id.* at 9–11, 21.

**103.** Day asserts that defendants' investigation was a "sham," which itself is evidence of pretext. (Opp. at 23). Day's argument on this point is that Jemo did not credit evidence that Grant and other males in upper-management engaged in inappropriate activity. (Opp. at 6–8). Even if Jemo wrongfully failed to credit all the evidence his investigation

uncovered, this does not demonstrate that defendants acted with discriminatory animus. Jemo conducted more than a dozen interviews while investigating Day's complaint; this included interviewing Day herself. Compare *Reeves v. Safeway Stores*, 121 Cal.App.4th 95, 117, 16 Cal.Rptr.3d 717 (2004) (holding that a supervisor acted with discriminatory animus because he "did not relay [sexual harassment] complaints to human resources;" "referred the matter to security rather than to

the court assumes that Day established a *prima facie* case of gender discrimination, she has not adduced substantial and specif-

ic evidence demonstrating that defendants' legitimate, nondiscriminatory reason for terminating her was a pretext for discrimination.[104]

the human resources department;" and "had ample time and opportunity to speak to plaintiff about the underlying incident, [but] he did not do so"). The mere fact that Day disagrees with Jemo's evaluation of the information he obtained does not demonstrate that the investigation was a sham or show that defendants acted with discriminatory motive.

**104.** At the hearing, Day advanced two additional arguments as to why she had raised triable issues of fact regarding pretext. First, she asserted that defendants' corporate policy permitted her to speak with Lawless regarding her concerns about Rea, and thus that defendants' proffered explanation that she was terminated for violating the confidentiality policy was unworthy of credence. Defendants' confidentiality policy states, in relevant part: "If something seems unethical or improper, or if you have questions regarding the best course of action, you should promptly contact any of the following: your supervisor, department manager or any SHC officer." (Yun Decl., Exh. 35). Day argues the policy permitted her to report an ethics concern to *any* supervisor or department manager lateral to her supervisor. (Opp. at 10). Day's interpretation of the policy, however, reads out the word "your" that precedes supervisor and department manager; this word indicates that an employee should report only to his or her actual supervisor or department manager, not supervisors in other departments. Even if Day's interpretation were plausible, however, as noted above, an employer's reason for terminating an employee need not be wise or even correct; it simply cannot be a decision driven by discriminatory animus. See *Wills*, 195 Cal.App.4th at 160, 125 Cal.Rptr.3d 1 ("The [employee] cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent"); see also *Odima v. Westin Tucson Hotel Co.*, 991 F.2d 595, 600 (9th Cir.1993) ("It must be recognized that it is not merely the falsity or incorrectness of the articulated reason that gives rise to the conclusion of pretext. Rather, it is the resulting absence of legitimate explanation for the suspect employment decision that warrants

the finding of discrimination"); *Bahl v. Royal Indem. Co.*, 115 F.3d 1283, 1291 (7th Cir. 1997) ("[T]he inquiry is not whether the reason for the firing was a correct business judgment but whether the decisionmakers honestly acted on that reason"). Even if defendants interpreted the confidentiality policy incorrectly, their interpretation was not so incredible as to render their conclusion that Day had breached confidentiality unworthy of credence. Stated differently, defendants' reliance on the policy is not, by itself, specific and substantial evidence that they acted with discriminatory animus. See *Clark v. Huntsville City Bd. of Educ.*, 717 F.2d 525, 528 (11th Cir.1983) ("Even if defendants incorrectly believed that their policy allowed consideration of relative qualifications, if they nonetheless based their decision on Todd's superior qualifications and not on plaintiff's race, they have not violated Title VII").

Day also argued that terminating her for having a brief conversation with Lawless was "excessive," and that excessive discipline is an indicator of pretext. Day cited no legal authority for this proposition, however. Nor did she cite evidence suggesting that the discipline imposed on her was excessive in relation to the discipline received by other employees. There is no evidence in the record, for example, that any other employee, male or female, found to have breached confidentiality, impeded an investigation, and lied during an investigation was not terminated. The only evidence regarding disciplinary measures imposed on other employees is the uncontroverted testimony of Brooks and Fowler that other employees, including a male employee, had previously been terminated for dishonesty (Brooks Decl., ¶ 7; Fowler Decl., ¶ 7), and Kaufman's testimony that she was placed on "final corrective action" for breaching confidentiality regarding an unrelated investigation and was warned she could be terminated (Exhibit List, Exhibit H ("Kaufman Depo.") at 62:21–63:9). Given the limited frame of reference provided by the record, the court cannot conclude that the discipline imposed on Day was "excessive" to the point that it renders defendants' proffered nondiscriminatory explanation unworthy of credence. As noted, it is commonplace for em-

### 5. Conclusion Regarding Day's Gender Discrimination Claims

For the reasons stated, defendants are entitled to summary judgment on Day's first and second causes of action.

### C. Whether Defendants are Entitled to Summary Judgment on Day's Third and Fourth Claims for Relief

■ Defendants next seek summary judgment on Day's third and fourth claims, which allege that defendants retaliated against Day for complaining about gender discrimination.[105] Under FEHA, it is an unlawful employment practice for any employer "to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under [FEHA] or because the person has filed a complaint, testified, or assisted in any proceeding under [FEHA]." CAL. GOV'T CODE § 12940(h). In assessing the viability of FEHA retaliation claims in the context of motions for summary judgment, California courts apply the same burden-shifting analysis discussed above. See *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal.4th 1028, 1042, 32 Cal.Rptr.3d 436, 116 P.3d 1123 (citing *McDonnell Douglas Corp.*, 411 U.S. at 802–05, 93 S.Ct. 1817).

■ To establish a *prima facie* case of retaliation, a plaintiff must show that (1) she engaged in a protected activity, (2) the employer subjected her to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action. *Nazir v. United Airlines, Inc.*, 178 Cal.App.4th 243, 287, 100 Cal.Rptr.3d 296 (2009) (citing *Miller v.*

*Department of Corrections*, 36 Cal.4th 446, 472, 30 Cal.Rptr.3d 797, 115 P.3d 77 (2005)).

State and federal courts in California have found that the following are protected activities under FEHA: (1) filing an administrative complaint or grievance, see *Barefield v. Board of Trustees of CA State University, Bakersfield*, 500 F.Supp.2d 1244, 1253 (E.D.Cal.2007) (discrimination grievance filed with the California Faculty Association); *McRae v. Department of Corrections and Rehabilitation*, 142 Cal. App.4th 377, 386, 48 Cal.Rptr.3d 313 (2006) ("It is not contested that Dr. McRae engaged in 'protected activity'—the filing of DFEH claims"); (2) making informal complaints to supervisors, see *Garcia v. Los Banos Unified School Dist.*, 418 F.Supp.2d 1194, 1224 (E.D.Cal.2006) ("Plaintiff alleged and provided evidence reasonably warranting an inference that she complained to Elliott, Heid's superior, about Heid's sexually derogatory 'ass wiping' remark and his having yelled at her and raised his fist in a physically threatening way"); and (3) serving as a witness in a coworker's FEHA proceeding, see *Steele v. Youthful Offender Parole Bd.*, 162 Cal. App.4th 1241, 1252, 76 Cal.Rptr.3d 632 (2008) ("Kaslar filed a complaint with the DFEH based, in part, on the YOPB retaliating against her for her report of the kissing incident involving Galindo and Lisa. Lisa was a 'potential witness' in such proceeding. Thus, Lisa was engaged in a protected activity so as to meet the first requirement for a claim of retaliation").

■ Defendants assert that Day did not engage in protected activity, and

---

ployers to terminate workers who violate company policies. Day's subjective opinion that termination was an excessive measure is simply insufficient to raise triable issues of fact regarding pretext. See *Schuler v. Chronicle Broad. Co. Inc.*, 793 F.2d 1010, 1011 (9th Cir.1986) ("[S]ubjective personal judgments do not raise a genuine issue of material fact").

105. Day's third claim for relief alleges retaliation due to complaints of gender discrimination in violation of FEHA, while her fourth claim for relief alleges wrongful termination in violation of the public policy against retaliation based on complaints of gender discrimination set forth in FEHA. As a consequence, the court considers the claims in tandem.

therefore cannot establish a *prima facie* case of retaliation. The court agrees. Day has adduced no evidence that she complained to her supervisors, or anyone else, regarding defendants' alleged gender discrimination. Her complaints about Grant stated only that she had received reports that he had acted unprofessionally. Specifically, in Day's August 25 email to Rea, which memorialized her complaint in writing, Day asserted that she was "very concerned at the lack of professional conduct displayed by Mark Grant." She stated that "there [was] significant concern that Mark's drinking is a problem beyond partying;" that there were reports of "Mark picking up women and drinking heavily" at company events; and that on several occasions Grant had failed to train employees effectively.[106] Day also stated that she had received reports from other employees that Grant had "carried on conversations that are inappropriate including drinking and women exploits."[107] In a follow-up email dated September 10, 2010, Day reiterated that she had received reports about Grant's "partying" and the fact that he made inappropriate remarks about women.[108] She conveyed Wold's report that Grant engaged in "inappropriate conversations regarding 'girlfriends' and infidelity."[109] These activities, while unbecoming,

do not constitute gender discrimination in violation of FEHA.[110] Absent evidence that Day complained of discriminatory treatment based on gender, her statements were not "protected activity" under FEHA. See *Peralta v. City and County of San Francisco*, 427 Fed.Appx. 616, 617 (9th Cir.2011) (Unpub. Disp.) ("Peralta has failed to make out a prima facie case of retaliation under the same statutes because his complaint to Senior Operating Manager George Louie about Britt's 'unprofessional' conduct was not a protected activity—it did not protest an unlawful employment practice"); *Chu v. Kaiser Foundation Health Plan*, No. B216827, 2010 WL 2816814, *10 (Cal.App.2010) (Unpub. Disp.) (finding no *prima facie* case of retaliation because "[t]he evidence of Chu's complaints shows that Chu essentially complained that Smith had engaged in unprofessional conduct");[111] see also *Peters v. District of Columbia*, 873 F.Supp.2d 158, 202 (D.D.C.2012) ("While informal complaints to management may constitute protected activity, the plaintiffs must clearly complain about discriminatory treatment"); *Henny v. New York State*, 842 F.Supp.2d 530, 560 (S.D.N.Y.2012) ("In particular, Plaintiff admits that at no time during any of her conversations with Patel or Ramcharitar did she say that she felt

---

106. Day Depo., Exh. 2.

107. *Id.*

108. Yu Decl., Exh. 14.

109. *Id.*

110. Day also sent Jemo and Rea an email on September 30, 2010, in which she thanked them for "allowing [her] to relay [her] concerns ... regarding a sexually hostile work environment by Mark Grant shared by me and my peers and direct reports." (Yu Decl., Exh. 14.) While this statement does not complain of gender discrimination in employment, it is pertinent to Day's claim that defendants retaliated against her for complaining about sexual harassment. Day has asserted

separate retaliation claims based on complaints of sexual harassment, which are discussed *infra*.

111. "Although the court is not bound by unpublished decisions of intermediate state courts, unpublished opinions that are supported by reasoned analysis may be treated as persuasive authority." *Scottsdale Ins. Co. v. OU Interests, Inc.*, No. C 05–313 VRW, 2005 WL 2893865, *3 (N.D.Cal. Nov. 2, 2005) (citing *Employers Ins. of Wausau v. Granite State Ins. Co.*, 330 F.3d 1214, 1220 n. 8 (9th Cir. 2003) ("[W]e may consider unpublished state decisions, even though such opinions have no precedential value")).

Abraham was receiving preferences because of her ethnicity, nor did Plaintiff ever say that she was being disfavored because of her race. Indeed, the Court invited Plaintiff's counsel at oral argument to point to any evidence in the record that she complained that Abraham's favorable treatment over Plaintiff was based on race or ethnicity, but counsel submitted nothing. Thus, Plaintiff has produced no evidence from which a reasonable jury could conclude that Defendants could have understood Plaintiff's complaints to be about racial or ethnic discrimination. Plaintiff therefore fails to make a prima facie case of retaliation under Title VII, and this claim is also dismissed").

As in *Peralta,* Day's complaint regarding Grant's behavior did not allege that he had engaged in an unlawful employment practice. No aspect of the complaint suggests that Day or other female employees had been treated less favorably because of their gender. In fact, Day testified that she did not believe she was ever denied a promotion or benefits due to her gender; [112] that no one made any gender-based statements in her presence that she felt were inappropriate; [113] and that she never received documents or writings that contained derogatory statements about her gender. [114] Thus, even if defendants were guilty of gender discrimination violating FEHA, Day has adduced no evidence that she complained about the discrimination to anyone.

For this reason, Day has failed to establish a *prima facie* case of retaliation due to complaints of gender discrimination. Defendants' motion for summary judgment on Day's third and fourth causes of action is therefore granted.

### D. Whether Defendants are Entitled to Summary Judgment on Day's Fifth and Sixth Claims for Relief

Defendants also seek summary judgment on Day's claims that defendants retaliated against her for complaining of sexual harassment and/or a hostile work environment. [115] In her complaint, Day alleges that she was terminated in retaliation for opposing sexually harassing conduct by defendants. [116]

---

**112.** Day Depo. at 120:23–121:8.

**113.** Day Depo. at 121:24–122:9.

**114.** Day Depo at 122:10–24.

**115.** Day's fifth claim for relief alleges retaliation due to complaints of sexual harassment in violation of FEHA, while her fifth claim for relief alleges wrongful termination in violation of the public policy against retaliation based on complaints of sexual harassment set forth in FEHA. As a consequence, the court considers the claims in tandem.

**116.** Complaint, ¶¶ 87–91. At the hearing, Day asserted that she had adduced direct evidence of retaliation. She cited her declaration, in which she stated that during the September 20 meeting among her, Jemo, Fowler, and Strand, she reiterated her complaint about Grant and "threatened to notify the appropriate outside authorities if nothing was done." (Day Decl., ¶ 34). Day contends that in response to her comment, "the interrogators were visibly upset and hostile," and "immediately got an angry look on their faces and started yelling at [her]." (*Id.*, ¶ 35). Day argued at the hearing that this was direct evidence of retaliation, and satisfied her burden of raising triable issues of fact regarding her sexual harassment/hostile work environment retaliation claims.

The Ninth Circuit addressed a similar set of facts in *Gerving v. Opbiz, LLC*, 324 Fed.Appx. 692, 695 (9th Cir.2009) (Unpub. Disp.). There, plaintiff complained about discriminatory remarks made by her supervisor. *Id.* at 694–95. When her complaint was discussed during a human resources meeting, her supervisor "became angry" and "attempted to fire her less than two weeks later." *Id.* at 695. The court determined that this evidence was sufficient to make out a *prima facie* case of retaliation. Notably, however, it did not conclude that the supervisor's reaction was direct evidence of retaliation; rather, the court engaged in a burden-shifting analysis

### 1. Day's *Prima Facie* Case of Retaliation for Complaints of Sexual Harassment or Hostile Work Environment

 Defendants argue first that Day cannot establish a *prima facie* case of retaliation because she did not engage in protected activity. FEHA "recognize[s] two theories of liability for sexual harassment claims[,] ... quid pro quo harassment, where a term of employment is conditioned upon submission to unwelcome sexual advances ... [and] hostile work environment, where the harassment is sufficiently pervasive so as to alter the conditions of employment and create an abusive work environment." *Hughes v. Pair,* 46 Cal.4th 1035, 1043, 95 Cal.Rptr.3d 636, 209 P.3d 963 (2009) (internal quotation marks omitted). The hostile work environment form of sexual harassment is "actionable only when the harassing behavior is *pervasive* or *severe.*" *Id.*

 Defendants argue that there is insufficient evidence of harassment to create a hostile work environment because

Grant's purported remarks were "occasional, isolated, sporadic, or trivial."[117] To prevail on her retaliation claim, however, Day need not prove that Grant actually engaged in conduct constituting sexual harassment; a complaint about sexual harassment is a protected activity "when the employee opposes conduct that the employee reasonably and in good faith believes to be [in violation of FEHA], whether or not the challenged conduct is ultimately found to violate the FEHA." *Yanowitz v. L'Oreal USA, Inc.,* 36 Cal.4th 1028, 1043, 32 Cal.Rptr.3d 436, 116 P.3d 1123 (2005).

In *Clark County School Dist. v. Breeden,* 532 U.S. 268, 271, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001), the Supreme Court held that "[n]o reasonable person could have believed" that "an isolated" incident of laughter over a salacious joke met the standard for harassment under Title VII, which is analogous to that applicable under FEHA. Specifically, it held that a single isolated remark is not "so severe or pervasive as to alter the conditions of [the vic-

---

under *McDonnell Douglas.* It thus appears that showing anger on one occasion in response to a protected complaint is not direct evidence sufficient, in and of itself, to raise triable issues of fact regarding retaliation. See also *Massey v. Johnson,* 457 F.3d 711, 719–20 (7th Cir.2006) (evidence that plaintiff's supervisor "[became] visibly angry at Ms. Mills for her [protected speech]" was sufficient to establish a *prima facie* case of retaliatory motive, but insufficient to raise a genuine issue of fact regarding pretext); *Bower v. Covington Foods, Inc.,* No. 1:10–cv–00790–LJM–DKL, 2012 WL 1099733, *7 (S.D.Ind. Mar. 30, 2012) (an ADA plaintiff's subjective belief that her supervisor "appeared angry" about the manner in which she injured herself was insufficient to raise triable issues as to whether defendants' proffered explanation for her termination was pretextual). Day cites no authority, and the court could not find any, stating that a plaintiff's subjective belief that her supervisor appeared angry in response to a complaint, without more, constitutes sufficient direct evidence of

retaliation to defeat summary judgment. At most, Jemo's, Fowler's, and Strand's purported reaction is sufficient to make out a *prima facie* case of retaliation.

Moreover, as with Day's argument that defendants treated Komadina differently than her after he complained about Grant's behavior, Day's opposition omits any argument that her interviewers' reaction to her complaint constituted direct evidence of retaliation. By failing to raise the argument in her brief, Day deprived defendants of the opportunity to respond properly. Because the argument was raised for the first time at the hearing, the court declines to consider it. See *Cataphora,* 2012 WL 13657 at *3; *Schultz v. Ichimoto,* No. 1:08–CV–526–OWW–SMS, 2010 WL 4643648, *2 (E.D.Cal. Nov. 9, 2010) ("Normally, arguments raised for the first time in a reply brief or at the hearing on a motion are disregarded").

117. MSJ at 21 (citing *Hughes v. Pair,* 46 Cal.4th 1035, 1043–44, 95 Cal.Rptr.3d 636, 209 P.3d 963 (2009)).

tim's] employment and create an abusive working environment." *Id.* at 270, 121 S.Ct. 1508 (internal quotation marks omitted). The evidence shows that Day's complaint was predicated on more than a single comment or incident. Day stated that she had received several reports of "Mark picking up women" at company events and engaging in "conversations that are inappropriate including drinking and women exploits." [118] Day's September 10 email to Jemo also recounted Wold's report that Grant engaged in "inappropriate conversations regarding 'girlfriends' and infidelity." [119] Day also asserts that during an in-person meeting with Jemo on September 20, 2010, she "verbally elaborated on [her] previous complaints, explaining that other men and women, including [Day], felt uncomfortable about the sexual comments and conduct by members of the Boys' Club." [120] Finally, on September 30, 2010, Day sent a follow-up email to Jemo in which she thanked him for "allowing [her] to relay [her] concerns ... regarding a sexually hostile work environment by Mark Grant shared by me and my peers and direct reports." [121]

Generally, whether a plaintiff's harassment complaint "was reasonable, in good faith and sincere ... is a credibility question that cannot be resolved by summary judgment." *Flait v. North American Watch Corp.*, 3 Cal.App.4th 467, 477, 4 Cal.Rptr.2d 522 (1992). Here, a jury could reasonably conclude that Day had a good faith belief that Grant's conduct violated FEHA. The fact that several different employees purportedly observed inappropriate conduct or heard salacious remarks by Grant and/or others in the "Boys' Club," on more than one occasion, suggests that Day may reasonably have believed that the conduct was more than just a "sporadic" or "isolated" occurrences, and constituted a pervasive pattern of conduct. This supports the conclusion that Day had a reasonable, good faith belief that defendants were in violation of FEHA. See *Holland v. Jefferson Nat. Life Ins. Co.*, 883 F.2d 1307, 1315 (7th Cir.1989) ("We also believe that Mrs. Holland could reasonably have believed she was opposing unlawful sexual harassment. Mrs. Holland complained of two sexually offensive remarks made by Schaffer, and she has put forward evidence that other employees had complained about Schaffer's use of vulgar language in the workplace.... This sort of workplace conduct is the type of activity that, under some circumstances, supports a charge of sexual harassment"); *Flait*, 3 Cal.App.4th at 471–72, 476–77, 4 Cal.Rptr.2d 522 (various complaints to a corporate officer about improper comments "made on at least one occasion" to a female employee constituted reasonable, good faith complaints of harassment under FEHA).

In short, in contrast to the complaint in *Breeden*, Day's complaints referenced multiple incidents and conversations, allegedly reported to her by multiple employees. A jury could thus conclude that she had a reasonable, good faith belief that Grant and/or others were violating FEHA. Consequently, she has adequately raised triable issues regarding the fact that she engaged in protected activity.

Defendants next argue that, even if her complaint constituted protected activity, Day has failed to adduce evidence that there was a causal link between the complaint and her termination. "Temporal proximity along with knowledge by the employer of the protected activity can satisfy the causation requirement." *Brandon*

**118.** Day Depo., Exh. 2.

**119.** Yu Decl., Exh. 14.

**120.** Day Decl., ¶ 32.

**121.** Yu Decl., Exh. 14.

*v. Rite Aid Corp., Inc.*, 408 F.Supp.2d 964, 979 (E.D.Cal.2006); see also *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir.2002) ("[C]ausation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity"); *California Fair Employment and Housing Commission v. Gemini Aluminum*, 122 Cal. App.4th 1004, 1020, 18 Cal.Rptr.3d 906 (2004) ("A causal link may be established with evidence demonstrating that the employer was aware of the protected activity and the adverse action followed within a relatively short time").

 The fact that Brooks participated in the decision to terminate Day, and allegedly knew she had complained of sexual harassment or a hostile work environment, suffices to raise triable issues of fact concerning defendants' knowledge of the protected activity.[122] See *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir.1982) ("Essential to a causal link is evidence that the employer was aware that the plaintiff had engaged in the protected activity"); see also *Reed v. Avis Budget Group, Inc.*, 472 Fed.Appx. 525, 526 (9th Cir.2012) (Unpub. Disp.) ("Reed's retaliation claim for the filing of the DFEH complaint fails because there was no evidence that managers Spain and Stephens, who made the decision not to rehire Reed, knew of the filing of the DFEH complaint. Human Resources Manager Height, who did know about the complaint, was not a decisionmaker"); *Heilman–Asmus v. Young*, 7 Fed.Appx. 694, 695 (9th Cir.2001) (Unpub. Disp.) ("As to Acts 1(a) and 12, there is no evidence in the record to support an inference that a transfer was based upon a retaliatory motive since there was no evi-

dence that the decision-maker was even aware of Heilman–Asmus' complaints").

As respects temporal proximity, the Ninth Circuit has held that gaps of one to three months between a plaintiff's protected activity and a defendant's adverse employment action can give rise to an inference of causation. See *Hernandez v. Spacelabs Med., Inc.*, 343 F.3d 1107, 1111, 1113 (9th Cir.2003) (interval of less than a month between protected activity and adverse action sufficed to show causal link); *Bell v. Clackamas County*, 341 F.3d 858, 865–66 (9th Cir.2003) (holding that temporal proximity supported a finding of a causal link where plaintiff was placed on administrative leave approximately three weeks after complaining, was returned to duty and placed back on leave not quite three months after complaining and was ultimately terminated seven months after complaining); *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir.1987) (there was sufficient evidence of causation where adverse action was taken less than three months after a complaint was filed, two weeks after the charge was first investigated, and less than two months after the investigation ended).

 Day's initial email to Rea was sent in late August; her follow-up meeting with Jemo, in which she purportedly complained verbally about an uncomfortable work environment, occurred on September 20. Her email to Jemo that specifically addressed her concern regarding a hostile work environment was sent on September 30. Very shortly thereafter, on October 4, Day was terminated.[123] It appears therefore there was a gap of just over one month between Day's initial complaint and

---

**122.** While Brooks does not expressly state that he knew the specifics of Day's complaint, he does acknowledge that he "reviewed the facts" related to her complaint and the investigation concerning her alleged breach of con-

fidentiality. (Brooks Decl., ¶ 8). A reasonable inference thus arises that Brooks knew of the nature of Day's complaint.

**123.** Brooks Decl., ¶ 9.

her termination. This suffices to raise triable issues of fact concerning causation.

Because Day has adduced evidence that she engaged in protected activity and evidence that suggests a causal link between such activity and her termination, she has established a *prima facie* case of retaliation based on complaints of a hostile work environment.

## 2. Defendants' Nondiscriminatory Reason for the Adverse Employment Action

The court has previously found that defendants have proffered evidence that they had a legitimate, non-discriminatory reason for terminating Day—i.e., her breach of the confidentiality. Thus, the burden shifts to Day to demonstrate that defendants' articulated reasons for termination were pretextual.

## 3. Whether Day Has Raised Triable Issues of Fact Concerning the Pretextual Nature of Defendants' Explanation

To show pretext, Day reasserts many of the same arguments she offered in support of her gender discrimination claim. She contends, for example, that defendants' proffered explanation concerning her termination was false, and that changes in defendants' explanation show it was pretextual.[124] For the reasons stated above, the court finds these arguments unavailing.

Day offers additional arguments, however, as to why defendants' proffered explanation is pretextual. First, she asserts that defendants have engaged in a pattern and practice of retaliating against women who complain of sexual harassment or gender discrimination.[125] Day argues that three other women lodged complaints between 2009 and 2010, and all three were terminated or resigned.[126]

▆▆ "[E]vidence of a pattern of retaliatory conduct is ... very persuasive" evidence of retaliatory motive. *Hammrich v. Potlatch Corp.*, 937 F.2d 612, 1991 WL 126366, *2 (9th Cir. June 28, 1991) (Unpub. Disp.). Plaintiff, however, "must show a stark pattern" of retaliation to demonstrate pretext. *Coleman*, 232 F.3d at 1283. Day's evidence regarding complaints by other women does not demonstrate a stark pattern of retaliatory conduct.

### a. Amy Kaufman

▆▆ Amy Kaufman was a former employee of Sears Outlet, who lodged a complaint in October 2009 with her supervisor, Ben Komadina, regarding sexual comments made by a co-worker.[127] The company undertook an investigation, and the employee about whom Kaufman complained was terminated.[128] Kaufman received a warning for speaking about the investigation with another employee, but was not terminated.[129] Kaufman asserts that in the spring of 2010, Brooks began "suddenly [to] appear" at her stores at odd hours of the evening and "barrage[d]" her with questions about her ability adequately to perform her job.[130] Kaufman testified that she was subjected to criticism "[s]even days a week." [131] Kaufman stated that she believed that her complaint regarding her co-worker was the "catalyst" that caused Brooks to treat her differently.[132]

---

124. Opp. at 21.

125. *Id.*

126. *Id.*

127. Supp. Kaufman Depo. at 205:2–22

128. *Id.* at 208:6–18.

129. Jemo Depo. at 87:6–21.

130. Kaufman Depo. at 82:2–11.

131. *Id.* at 82:9–11.

132. *Id.* at 46:6–23.

She concluded that defendants would eventually terminate her and therefore resigned her position.[133]

Other than Kaufman's conclusory opinion that Brooks began criticizing her because of her complaint, there is no evidence in the record that Kaufman was a victim of retaliation. See *Freund v. Sierra Pacific Resources,* 319 Fed.Appx. 636, 638 (9th Cir.2009) (Unpub. Disp.) ("Freund's conclusory assertions that NPC must have had a discriminatory intent in discharging him are insufficient to avoid summary judgment"); *Tarin v. County of Los Angeles,* 123 F.3d 1259, 1265 (9th Cir.1997) ("Because Tarin points to nothing in the record, other than her own conclusory statements, to refute the County's explanations for its decisions, we affirm the district court's grant of summary judgment to defendants with respect to Tarin's claims of unlawful retaliation"), superseded by statute on other grounds as recognized in *Leisek v. Brightwood Corp.,* 278 F.3d 895 (9th Cir.2002). Kaufman was not formally disciplined or terminated for making a complaint; rather, the alleged harasser was terminated. Kaufman's performance, moreover, was not criticized until months after she made her complaint. Additional-ly, Kaufman participated in a separate investigation regarding similarly inappropriate comments made by a different male co-worker and received no discipline as a result.[134] Finally, although Kaufman asserts that Brooks barraged her with criticism, it is undisputed that Brooks did not know of Kaufman's complaint and was not involved in the decision to issue her a warning.[135] Absent evidence that Brooks was aware of Kaufman's complaint, his conduct towards her cannot be deemed retaliatory, as there is no causal link between his actions and the protected activity. Based on the evidence in the record, defendants' treatment of Kaufman does not support an inference that they engaged in a "stark pattern" of retaliation.

**b. Geraldine Knapp**

 Day next cites defendants' treatment of Geraldine Knapp, an associate in a Sears Outlet store who complained about an incident of sexual harassment.[136] Jemo was assigned to investigate Knapp's complaint. In August 2010, Day served as a witness during Jemo's interview of Knapp.[137] Day contends that Jemo told her that her assignment was to act as an "appropriate female," and that he had found a way to "get" Knapp on a "technicality."[138] Soon after this interview,

---

**133.** Supp. Kaufman Depo. at 128:1–8. ("Q: Why did you resign? A: The—it was obvious to me that the direction that my career was headed there was going to probably not end up with me still employed with Sears Holdings. Q: Did you feel like you were going to be fired from that employ? A: Yes").

**134.** *Id.* at 236:13–238:5.

**135.** Supp. Parker Decl., Exh. 23 ("Supp. Brooks Depo.") at 245:25–246:7; 253:2–11).

**136.** Jemo Depo. at 76:9–21.

**137.** Day Decl., ¶¶ 87–88.

**138.** *Id.,* ¶¶ 90, 92. Accepting for purposes of this motion that Jemo made this comment, it is not entirely clear when he stated he would "get" Knapp. There is no evidence that

Knapp herself was the subject of an investigation, or that she was ever disciplined based on a "technicality." There is also no evidence regarding the outcome of the investigation of Knapp's complaint or whether the accused individuals were disciplined.

Defendants object to Day's testimony concerning Jemo's remarks as hearsay. (Objections at 11–12). Jemo's out-of-court statements, however, qualify as party admissions, given that he was acting within the scope of his employment with defendants when the statements were made. See FED.R.EVID. 801(d)(2)(D) ("A statement is not hearsay if ... [t]he statement is offered against a party and is ... a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship"). Defendants' objection is therefore overruled

Knapp resigned from her position.[139]

Viewed in the light most favorable to Day, this evidence shows that the investigation of Knapp's complaint may not have been thoroughly or honestly conducted. It does not, however, demonstrate that defendants retaliated against Knapp for making a complaint. While Jemo allegedly stated he would get Knapp on a technicality, there is no evidence that Knapp was disciplined, terminated, or treated differently in any way after she made her complaint. Rather, the evidence shows that she resigned from her position, possibly even before the investigation of her complaint was complete.[140] Day describes nothing that transpired during Jemo's interview of Knapp that could be denominated explicit or implicit threats of retaliation or pressure to resign. Nor does she state that Jemo focused during the interview on Knapp's conduct or actions. Moreover, there is no evidence that Brooks or Fowler, the two decisionmakers in Day's case, were involved in any way in the investigation of Knapp's complaint.[141]

See *Schrand v. Federal Pacific Elec. Co.*, 851 F.2d 152, 156 (6th Cir.1988) (holding that evidence of discrimination against other employees was irrelevant because "Pierce, who made the decision to terminate Schrand, was not involved in the decision to terminate either Owens or Dolan"). Absent evidence of retaliatory actions taken by defendants, the court cannot find that Knapp's resignation on the heels of her complaint demonstrates a stark pattern of retaliation.

#### c. Penny Parker

██ Finally, Day cites defendants' treatment of Penny Parker, a district manager in Florida.[142] Parker asserts that she complained to Jemo about inappropriate sexual conduct by Calderwood in June 2009.[143] She states that the day after she made her complaint, she was placed on a performance improvement plan.[144] Subsequently, on April 21, 2010, she filed a gender discrimination and retaliation complaint with the EEOC.[145] Parker was terminated shortly thereafter for purported performance-related problems.[146]

139. Jemo Depo. at 80:2–21 ("Q: Was Ms. Knapp terminated? A: No, she was not. Q: Did she resign? A: Yes, she left the company. Q: When did she leave the company? A: I want to say it was August of 2010, but I'm not exactly positive, but somewhere around that timeframe.... It was within a week or two, to the best of my recollection, of that meeting [with Day]"). The evidence is unclear whether the investigation of Knapp's complaint had concluded by the time she resigned or if it was still ongoing. See *id.* at 80:10–14 (Q: Was [Knapp's resignation] during the course of the investigation or after its completion? A: I want to say it was towards the end. I don't specifically recall if the investigation was finalized or not").

140. Jemo Depo. at 80:2–5 ("Q: Was Ms. Knapp terminated? A: No, she was not. Q: Did she resign? A: Yes, she left the company").

141. See e.g. Supp. Parker Decl., Exh. 24 ("Supp. Fowler Depo.") at 144:22–145:3 ("Q: So all you knew about the Geraldine Knapp issue is that she had called the ASO hotline, and that Chris Jemo went to Denver, that he's wrapping it up; but aside from that, you don't know any specifics about the complaint? A: No, I don't").

142. Yun Decl., Exh. 51, ¶ 7.

143. Yun Decl., Exh. I ("Parker Depo."), at 51:25–52:18.

144. *Id.* at 70:10–14 ("I got put on performance plan the day after I went to [Jemo] with the facts of that incident, and there had been no conversation of the performance plan for months prior to that. So I felt like that was, you know, their response to me bringing those facts to them").

145. *Id.* at 222:16–20.

146. *Id.* at 146:15–17 ("Q: And what was the reason they gave you for being fired? A: Performance").

Even assuming Parker was a victim of unlawful retaliation, her termination does not suffice to show that defendants engaged in a stark pattern of retaliatory conduct, or raise triable issues of fact as to whether defendants' proffered non-discriminatory reason for terminating Day was pretextual. Parker is a single employee. The fact that one other employee was terminated after complaining about inappropriate sexual conduct is far too small a sample to support an inference of retaliatory motive in Day's case. See *Aragon*, 292 F.3d at 663 (9th Cir.2002) ("[T]he fact that three of the four casuals singled out for lay off that night were white could constitute circumstantial evidence of discrimination demonstrating pretext.... Yet, because the sample size is so small, we decline to give it much weight"). More importantly, there is no evidence that Brooks or Fowler, the decisionmakers in Day's case, were involved in Parker's termination.[147] Accordingly, evidence of retaliation against Parker is of minimal relevance and cannot be deemed substantial evidence of pretext. See *Schrand*, 851 F.2d at 156 (evidence of discrimination against one other employee insufficient); see also *Machado v. Johnson*, 191 Fed. Appx. 531, 533 (9th Cir.2006) (Unpub. Disp.) (holding that discriminatory conduct by an individual who was not involved in the decision to terminate plaintiff was not

relevant to plaintiff's claim). Compare *Johnson v. United Cerebral Palsy/Spastic Children's Foundation of Los Angeles*, 173 Cal.App.4th 740, 759, 93 Cal.Rptr.3d 198 (2009) (finding "me too" evidence of discrimination was substantial evidence of pretext where the other wronged employees "worked at the same facility where plaintiff worked, [and] they were supervised by the same people that supervised plaintiff").

Ultimately, there is no evidence, aside from the opinion of Day and the three women whose treatment she cites, that they were victims of retaliation. Their opinions alone are not sufficient to raise triable issues of fact as to whether the proffered explanation for Day's termination was pretextual. See *Welsh v. City of Shawnee*, 182 F.3d 934, 1999 WL 345597, *8 (10th Cir. June 1, 1999) (Unpub. Disp.) ("The allegations of discrimination and retaliation against other employees similarly do not show pretext or intentional discrimination," as the evidence consisted only of opinions lacking "strong corroborative support"); *Schuler*, 793 F.2d at 1011 (absent corroborating evidence, "subjective personal judgments do not raise a genuine issue of material fact"). Thus, for the reasons stated, Day's evidence regarding Kaufman, Knapp, and Parker is insufficient to demonstrate a stark pattern of retaliation by defendants against employees who complain about harassing behavior.[148]

---

**147.** See Supp. Jemo Depo. at 181:9–16 ("Q: How about Penny Parker, was [Brooks] involved in the separation of Penny Parker? ... A: As the president of the organization, he would have been aware of it. He was not involved in the decision-making process. That would have been Margaret Lawless").

**148.** At the hearing, Day argued that, although different decisionmakers were involved in each of these alleged incidents of retaliation, Jemo was involved all three. Day, however, adduced no evidence that Jemo was involved in her termination or acted inappropriately in connection therewith. She does not identify

him as a member of the purported "Boys' Club" that fostered a male-dominated atmosphere at Sears. (SGI, ¶ 124). Nor was Jemo a decisionmaker in her case; he was tasked only with conducting interviews and compiling facts, which were then communicated to Fowler and Brooks. (SUF, ¶ 62; SGI, ¶ 62). Although Day contends that Jemo "failed to inform ... Fowler" of the facts he uncovered during his investigation (SGI, ¶ 173), the evidence she cites for this proposition does not support it. (See Yu Decl., Exh. M ("Fowler Depo.") at 279:19–280:18). Fowler's testimony shows only that she did not interpret Day's complaint about

Finally, even if all of Kaufman, Knapp and Parker were victims of retaliation, three incidents of retaliation are not sufficient to raise triable issues of fact concerning a "stark pattern" of retaliation by defendants. See, e.g., *Aragon*, 292 F.3d at 663–64 (rejecting a pretext argument in opposition to a motion for summary judgment based on the fact that three of four casual workers laid off on a particular day were Caucasian because "statistical evidence [based on such a small sample size] presents no stark pattern, nor does it account for possible nondiscriminatory variables, such as job performance"); *Mundy v. Household Fin. Corp.*, 885 F.2d 542, 546 (9th Cir.1989) ("In a large corporation with branch offices throughout the country, the discharge of seven older employees over a two and half year period alone does not establish a pattern or practice of discrimination"); *Henshaw v. Hartford Ins. Co.*, No. Civ. S04–0022DFLKJM, 2005 WL 1562265, *10 (E.D.Cal. June 30, 2005) ("Even if these eight other employees are sufficiently comparable, the court cannot say they create a sufficiently "stark pattern unexplainable on grounds other than age" without further statistical evidence").[149]

Grant as a complaint about "sexual comments;" she interpreted it as a complaint that Grant "was going drinking and that he liked girls and that [other employees] felt it was inappropriate." (*Id.*) This testimony does not demonstrate that Jemo withheld relevant information; it addresses only how Fowler *interpreted* the information she received. There is no evidence that Fowler reached her conclusions based on an incomplete set of facts, or that Jemo withheld or obscured pertinent information. Moreover, Jemo's findings were supplemented by an independent investigation conducted by O'Malley. (SUF, ¶ 58; SGI, ¶ 58). The findings were also reviewed by Colleen Kozak, Divisional Vice President of Human Resources for Sears Holdings Management Corporation, who concluded that the Day investigation was conducted properly and that her termination was appropriate. (Parker Decl., Exh. 18 ("Kozak Decl."), ¶ 6). Absent evidence that Jemo acted inappropriately while investigating Day, his involvement in other, unrelated investigations is not probative of pretext. This is particularly true since there is no evidence in the record that Jemo acted unlawfully in investigating other female employees. In fact, the record reflects that at the conclusion of Jemo's investigation concerning Kaufman's complaint, the alleged harasser was terminated.

Day argues essentially that, since Jemo was involved in each of the purportedly retaliatory actions, the simple fact that he was also involved in the events leading to her termination is sufficient to raise triable issues of fact regarding pretext. Jemo is a human resources employee, however, and the fact that he was involved in a series of investigations concerning alleged employee wrongdoing is not surprising. Absent evidence that raises triable issues of fact as to whether he retaliated during each of the investigations, including Day's, his involvement is insufficient to demonstrate that defendants engaged in a pattern and practice of retaliation.

**149.** The Ninth Circuit has "upheld inferences of discriminatory motive based on comparative data involving a small number of employees when the plaintiff establishes that he or she is 'similarly situated to those employees in all material respects.'" *Beck v. United Food and Commercial Workers Union, Local 99*, 506 F.3d 874, 885 (9th Cir.2007). Here, however, Day adduces no evidence that she and Kaufman, Knapp and Parker were similarly situated employees. Kaufman and Knapp appear to have been sales associates working in Sears stores; they were not upper-level management employees like Day. While it appears that Parker was a management employee, she is not similarly situated to Day because the nature of her misconduct is markedly different than Day's. Parker was purportedly terminated for performance problems; Day violated a company policy requiring that human resources investigations be kept confidential. *Vasquez*, 349 F.3d at 641 ("individuals are similarly situated when they have similar jobs and display similar conduct"); see also *Moran v. Selig*, 447 F.3d 748, 755 (9th Cir.2006) (plaintiff must be "similarly situated to those employees in all material respects").

### 4. Other Evidence of Pretext

■ Day also asserts that the timing of her discharge demonstrates pretext.[150] "Temporal proximity between protected activity and an adverse employment action can by itself constitute sufficient circumstantial evidence of retaliation in some cases." *Bell v. Clackamas County*, 341 F.3d 858, 865 (9th Cir.2003). However, "temporal proximity alone is not sufficient to raise a triable issue as to pretext once the employer has offered evidence of a legitimate, nondiscriminatory reason for the termination." *Arteaga v. Brink's, Inc.*, 163 Cal.App.4th 327, 353, 77 Cal.Rptr.3d 654 (2008) (disability discrimination case); see also *Stegall v. Citadel Broadcasting Co.*, 350 F.3d 1061, 1070 (9th Cir.2003) (noting that "timing, standing alone, may be insufficient to raise a genuine issue with respect to pretext"). As the Ninth Circuit stated in *Coszalter v. City of Salem*, 320 F.3d 968 (9th Cir.2003),

> "We ... reject any bright-line rule about the timing of retaliation. There is no set time beyond which acts cannot support an inference of retaliation, and there is no set time within which acts necessarily support an inference of retaliation. Whether an adverse employment action is intended to be retaliatory is a question of fact that must be decided in the light of the timing and the surrounding circumstances. In some cases, the totality of the facts may form such a clear picture that a district court would be justified in granting summary judgment, either for or against a plaintiff, on the issue of retaliatory motive; but the length of time, considered without regard to its factual setting, is not enough by itself to justify a grant of summary judgment." *Id.* at 978.

As noted, just over one month elapsed between Day's initial complaint and her termination. The sequence of events that unfolded during that time, however, belies her assertion that the temporal proximity of the complaint and termination raises triable issues of fact regarding pretext.

■ Immediately after receiving Day's August 25 email documenting her complaints, Rea forwarded the allegations to Jemo, as Rea deemed the complaint sufficiently serious to warrant the involvement of the human resources department. Jemo immediately began an investigation regarding the complaint, and interviewed thirteen individuals. He ultimately concluded that Grant had acted unprofessionally and issued a Documentation of Performance Issues warning. There is no evidence that, in the immediate aftermath of Day's complaint, defendants took any adverse action against her; rather, it was not until Lawless notified Brooks and Rea that Day had spoken to her about the complaint that defendants began to investigate Day's conduct. Thus, although Day's termination was close in time to her protected activity, there was an intervening breach of company policy. See *Arteaga*, 163 Cal.App.4th at 354, 77 Cal.Rptr.3d 654 ("'Employers are sometimes forced to remove employees who are performing poorly, engaging in improper work conduct, or severely disrupting the workplace.... Precedent does not prevent [an employer] from removing such an employee simply because the employee [recently] engaged in a protected work activity,'" quoting *Strong v. University Healthcare System, L.L.C.*, 482 F.3d 802, 808 (5th Cir.2007)); see also *Thompson v. Bi–State Development Agency*, 463 F.3d 821, 826 (8th Cir. 2006) (holding that temporal proximity alone was insufficient to preclude summary judgment on a retaliation claim where plaintiff's return to work was the employer's "first opportunity to address the [bus]

**150.** Opp. at 23.

accident [in which plaintiff had been involved] and the disciplinary action to be taken"); *Orluske v. Mercy Medical Center–North Iowa,* 455 F.Supp.2d 900, 922 (N.D.Iowa 2006) (timing does not establish a retaliatory motive when discipline "follow[ed] promptly on the heels of other misconduct unrelated to her complaint about sexual harassment of third parties"). This is not a case in which Day was terminated for poor performance or activity that had been ongoing for some time; rather, defendants learned of Day's breach very shortly after Day made her complaint because the breach involved the complaint and ensuing investigation. In a case such as this where the proffered explanation for termination is a breach of confidentiality regarding an investigation *initiated as a result of a protected complaint,* the timing of the discharge will necessarily be proximate to the protected activity. Thus, considering the factual setting here, the "mere coincidence of timing" is not sufficient to demonstrate retaliatory motive. *Kipp v. Mo. Highway & Transp. Comm'n,* 280 F.3d 893, 897 (8th Cir.2002); *Smith v. Allen Health Systems, Inc.,* 302 F.3d 827, 834 (8th Cir.2002) ("[T]he relation between the timing of Smith's leave and her firing is not mere coincidence, but has a causal explanation that hurts, rather than helps Smith's case: it was precisely because Smith was on leave that the she left the receipts on a chair, where someone else found them and took them to Justis, giving him his first notice of how far behind Smith actually was. This gives an explanation for the temporal proximity other than a retaliatory motive of the employer").

Moreover, the investigation concerning Day's purported breach of confidentiality began in early September, as Lawless gave a written statement regarding her conversation with Day on September 9.

Day's complaints regarding a hostile work environment and her discomfort with it were not made until she met with Jemo on September 20 and emailed him on September 30. Day's only complaint before the investigation of her breach of the confidentiality policy began was her August 25 email to Rea in which she complained generally about Grant's lack of professionalism.[151] The fact that an investigation concerning Day's breach of confidentiality was already underway at the time Day made complaints about a hostile work environment in September undercuts her argument that the timing of her discharge is evidence of pretext. See *Arteaga,* 163 Cal. App.4th at 353, 77 Cal.Rptr.3d 654 (temporal proximity is insufficient to raise triable issues as to pretext "where the employer raised questions about the employee's performance *before* he disclosed his [concerns about discrimination], and the subsequent termination was based on those performance issues"); see also *Smith,* 302 F.3d at 834 ("Evidence that the employer had been concerned about a problem before the employee engaged in the protected activity undercuts the significance of the temporal proximity"). For all of these reasons, the court concludes that the timing of Day's termination in relation to her protected activity is insufficient to demonstrate a triable issue of fact regarding defendants' retaliatory motive.

In sum, "the circumstantial evidence of discriminatory intent in this case is weak and insufficient to carry [Day's] burden of providing 'specific and substantial' evidence of pretext." *Medina v. Multaler, Inc.,* 547 F.Supp.2d 1099, 1132 (C.D.Cal. 2007). The court therefore grants defendants' motion for summary judgment on Day's fifth and sixth causes of action for retaliation.

**151.** See Yu Decl., Exh. 14.

### E. Whether Defendants are Entitled to Summary Judgment on Day's Seventh Cause of Action for Wrongful Termination in Violation of Public Policy

██ Day's seventh cause of action asserts a claim for wrongful termination in violation of public policy.[152] California law recognizes a claim for wrongful termination in violation of a public policy reflected in a statute or constitutional provision. *Tameny v. Atlantic Richfield Co.*, 27 Cal.3d 167, 172, 164 Cal.Rptr. 839, 610 P.2d 1330 (1980) ("In a series of cases arising out of a variety of factual settings in which a discharge clearly violated an express statutory objective or undermined a firmly established principle of public policy, courts have recognized that an employer's traditional broad authority to discharge an at-will employee 'may be limited by statute . . . or by considerations of public policy'" (citations omitted)); see also *Kelly v. Methodist Hospital of Southern California*, 22 Cal.4th 1108, 1112, 95 Cal. Rptr.2d 514, 997 P.2d 1169 (2000) ("*Tameny* claims permit wrongful termination damages when a termination is undertaken in violation of a fundamental, substantial and well-established public policy of state law grounded in a statute or constitutional provision"); *Gantt v. Sentry Insurance*, 1 Cal.4th 1083, 1094–95, 4 Cal.Rptr.2d 874, 824 P.2d 680 (1992) (same), disapproved on other grounds in *Green v. Ralee Engineering Co.*, 19 Cal.4th 66, 78 Cal.Rptr.2d 16, 960 P.2d 1046 (1998).

Plaintiff bears the burden of identifying the specific statute(s) or constitutional provision(s) on which she bases her *Tameny* claim. *Green*, 19 Cal.4th at 83, 78 Cal. Rptr.2d 16, 960 P.2d 1046 ("[I]n wrongful termination cases we have rejected public policy claims that were 'largely unaccompanied by citations to specific statutory or constitutional provisions.' We observed that the omission 'puts [the defendant] and the court in the position of having to guess at the nature of the public policies involved, if any. This kind of showing is plainly insufficient to create an issue of *material* fact justifying a trial on the merits of [the plaintiff's] claims,'" quoting *Turner v. Anheuser–Busch, Inc.*, 7 Cal.4th 1238, 1257, 32 Cal.Rptr.2d 223, 876 P.2d 1022 (1994) (affirming the entry of summary judgment on a wrongful termination claim premised on vague references to "the Alcohol, Tobacco and Firearms laws")); see also *Harrison v. Comcast*, No. C–04–4880 VRW, 2006 WL 2734322, *5 (N.D.Cal. Sept. 25, 2006) ("Harrison was represented by counsel when his complaint was filed. And yet his complaint does not identify any specific statutory or constitutional provision that would be undermined by his termination. Although Harrison alleges that his termination is against 'the public policy prohibiting retaliatory termination for exercising an employee's legal rights,' he fails to identify what those legal rights are"); *Woodall v. Asset Marketing Systems Ins. Services, LLC*, No. D048578, 2008 WL 162970, *4 (Cal.App. Jan. 18, 2008) (Unpub. Disp.) ("We recognize that . . . Woodall's counsel periodically referenced amorphous concepts of potentially applicable public policy to support her claim, asserting, for example, that AMS's actions were 'fraudulent' and could potentially have led to financial 'elder abuse.' These vague assertions, however, without any citation to specific statutory, regulatory or constitutional provisions and devoid of any analysis as to how AMS's actions could be found by a 'reasonable trier of fact' to violate the (unstated) provisions, are insufficient at the summary judgment stage"); *Mello v. OMYA (California), Inc.*, No. E033951, 2004 WL 1879871, *3 (Cal. App. Aug. 24, 2004) (Unpub. Disp.)

---

**152.** Complaint, ¶¶ 98–99.

("OMYA pointed out that Mello's complaint did not identify any statutory or constitutional provision that formed the basis for his claim. Instead, it merely identified 'a fundamental policy interest in providing employees with a work place environment free from illicit and wrongful fabrications made by their employers.' Such vague statements, untethered to any specifically named provision are insufficient to survive summary judgment").

In her complaint, Day asserts that she was discharged as a result of reporting safety concerns to her supervisors.[153] Specifically, she argues that she was terminated for complaining about employees driving cars under the influence of alcohol during business trips in violation of California Vehicle Code § 23152. Day asserts that California Labor Code § 1102.5 et seq. and § 6403 et seq. establish a fundamental policy pursuant to which an employer may not discharge an employee for complaining about workplace safety.[154]

### 1. California Labor Code § 1102.5

California Labor Code § 1102.5 provides, in relevant part:

"An employer may not retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation or non-compliance with a state or federal rule or regulation." CAL. LAB.CODE § 1102.5(b).

Defendants assert there is no evidence that Day engaged in protected activity, as she has adduced no evidence that she complained about workplace safety to any government or law enforcement agency. Day, however, does not allege a direct violation of § 1102.5; rather, she identifies the statute as the predicate policy for a wrongful termination claim. It is well-established that Labor Code § 1102.5 evinces the Legislature's intent to protect whistleblowers as a matter of public policy. See *Green*, 19 Cal.4th at 76–77, 78 Cal. Rptr.2d 16, 960 P.2d 1046 ("Section 1102.5, subdivision (b), concerns employees who report to public agencies. It does not protect plaintiff, who reported his suspicions directly to his employer. *Nevertheless, it does show the Legislature's interest in encouraging employees to report workplace activity that may violate important public policies that the Legislature has stated*" (emphasis added)); *Collier v. Superior Court*, 228 Cal.App.3d 1117, 1123, 279 Cal.Rptr. 453 (1991) ("[Section 1102.5(b)], which prohibits employer retaliation against an employee who reports a reasonably suspected violation of the law to a government or law enforcement agency, reflects the broad public policy interest in encouraging workplace 'whistleblowers,' who may without fear of retaliation report concerns regarding an employer's illegal conduct.... Even though the statute addresses employee reports to public agencies rather than to the employer and thus does not provide direct protection to petitioner in this case, *it does evince a strong public interest in encouraging employee reports of illegal activity in the workplace*" (emphasis added; citations omitted)). Accordingly, Day can rely on § 1102.5 as a statutory predicate for a *Tameny* claim even absent evidence that she complained to a government agency. See *id.* at 1127, 279 Cal.Rptr. 453 ("Retaliation by an employer when an employee seeks to further this well-established public policy by responsibly reporting suspicions of illegal conduct to the employer seriously impairs the public interest, even though the employee is not coerced to participate or restrained

---

**153.** Complaint, ¶¶ 97–102.

**154.** *Id.*, ¶ 98.

from exercising a fundamental right. The absence of such coercion and restraint does not defeat a legal action for wrongful termination" (citation omitted)).

 In assessing a claim for wrongful termination in violation of public policy, "California courts apply the burden shifting analysis as set forth in *McDonnell Douglas*." *Velto v. Draeger Medical, Inc.,* No. C06–5190RBL, 2007 WL 4376200, *3 (W.D.Wash. Dec. 13, 2007), citing *Nelson v. United Technologies,* 74 Cal.App.4th 597, 613, 88 Cal.Rptr.2d 239 (1999); see also *Loggins v. Kaiser Permanente Intern.,* 151 Cal.App.4th 1102, 1108–09, 60 Cal.Rptr.3d 45 (2007) ("When a plaintiff alleges retaliatory employment termination … as a claim for wrongful employment termination in violation of public policy, and the defendant seeks summary judgment, California follows the burden shifting analysis of *McDonnell Douglas Corp.*"). Assuming, without deciding, that Day could prove a *prima facie* case of wrongful termination, she must demonstrate that defendants' proffered nondiscriminatory explanation for her termination is pretextual. Day offers no new arguments regarding pretext in support of her wrongful termination in violation of § 1102.5 claim. The court concludes, therefore, for the reasons detailed above, that she has failed to meet her burden of raising triable issues of fact regarding pretext. To the extent that it is based on the policy behind § 1102.5, therefore, defendants are entitled to summary judgment on Day's seventh cause of action for wrongful termination.

## 2. California Labor Code § 6403 et seq.

Under California Labor Code § 6403:
"No employer shall fail or neglect to do any of the following:

(a) To provide and use safety devices and safeguards reasonably adequate to render the employment and place of employment safe.

(b) To adopt and use methods and processes reasonably adequate to render the employment and place of employment safe.

(c) To do every other thing reasonably necessary to protect the life, safety, and health of employees."

 The termination of an employee for complaining about a violation of § 6403 will support a cause of action for wrongful termination in violation of public policy. See *Khachatrian v. Stanford University,* No. C 97–20833 PVT, 1998 WL 856084, *3 (N.D.Cal. Dec. 4, 1998) ("[A]n employee's complaints regarding perceived violations of Labor Code sections 6400, 6401 and 6403 constitute 'protected activity.' Those Labor Code sections are statutes of 'public importance' for purpose of evaluating a claim of termination in violation of public policy").

Day's only complaint regarding unsafe conditions was her complaint that Grant and Calderwood reportedly drove a rental car under the influence of alcohol during an after-work event.[155] Day cites no authority for the proposition that such a complaint qualifies as a complaint about unsafe working conditions. In *Calrow v. Appliance Industries, Inc.,* 49 Cal.App.3d 556, 571, 122 Cal.Rptr. 636 (1975), the court determined that an employer had not violated § 6403 when an employee returned to work after-hours and became intoxicated on the premises with alcohol the employer did not provide. *Id.* at 572, 122 Cal.Rptr. 636 (no violation of § 6403 where "[t]he fact is clearly shown in plaintiffs' opening statement that defendant Beaudoin was not working at his job at the

---

**155.** Complaint, ¶ 98; Day Decl., ¶ 26.

time the drinking took place. He had returned to the premises of his employer on his off-duty hours to work on his own car. And the facts presented by plaintiffs show that the alcoholic beverages were not supplied by Appliance but by a fellow employee of Beaudoin who was also off-duty"). Additionally, § 6403's requirement that "employees be furnished a safe place of employment relates to the *physical condition* of the place rather than activities of other employees." *Cole v. State of California,* 11 Cal.App.3d 671, 675, 90 Cal.Rptr. 74 (1970); see also *Burnette v. Godshall,* 828 F.Supp. 1439, 1446 (N.D.Cal. 1993) ("Labor Code section 6400 relates to the physical conditions of the workplace (i.e., machinery repairs, toxics, etc.) and not to employee conduct"). Finally, Labor Code § 6303 defines "place of employment" as "any place, and the premises appurtenant thereto, where employment is carried on." Grant's and Calderwood's purported drunk driving did not occur at Day's place of employment; rather, it was off-site. Ultimately, Day's allegations concerned employee behavior that occurred off defendants' premises, not unsafe working conditions at her place of employment. Thus, it does not appear that a complaint that employees were driving drunk after hours qualifies as a complaint that defendants violated § 6403.

 Moreover, even if conduct by employees off-site and after hours could

violate § 6403, Day's complaint nowhere reports safety concerns or dangerous working conditions; rather, she complains about the unprofessional nature of Grant's and Calderwood's behavior.[156] Section 6403 does not establish a public policy that all employees of private businesses must act professionally. Consequently, a complaint of unprofessional activity will not support a retaliation claim based on the statute. Compare *Davaris v. Cubaleski,* 12 Cal.App.4th 1583, 1589, 16 Cal.Rptr.2d 330 (1993) (granting a demurrer to plaintiff's claim of termination in violation of public policy because "[Labor Code §§ 6401 and 6403] do not support a public policy of encouraging proper medical care. Rather, they put an employer under a legal duty to maintain a safe and healthful workplace"). Because Day has failed to adduced evidence that she engaged in protected activity, defendants are entitled to summary judgment on her cause of action for wrongful termination in violation of the public policy set forth in Labor Code § 6403.[157]

### 3. Conclusion Regarding Day's Seventh Cause of Action

For the reasons stated, the court grants defendants' motion for summary judgment on Day's seventh cause of action for wrongful termination in violation of public policy.

---

**156.** For example, in her August 25, 2010 email to Rea, Day stated that "Drinking is a problem when it interferes with professional conduct."

**157.** As Day has not established that she engaged in protected activity, the court need not address whether she has established a causal link between her complaint and her termination. At the hearing, Day argued that evidence that her interviewers became angry during the September 20 meeting in response to her complaint concerning Grant's behavior

was direct evidence of retaliation in response to her complaint of § 6403 violations. Day, however, proffered no additional argument as to why her complaint qualified as a complaint about workplace safety. She asserted only that the complaint indicated she was "concern[ed] about safety," and that driving under the influence of alcohol presents a danger to the public. As noted, § 6403 does not require employers to guarantee the safety of the general public; it requires them only to ensure that the physical place of employment safe. Day's argument is therefore unavailing.

## F. Whether Defendants are Entitled to Summary Judgment on Day's Eighth and Ninth Claims for Relief

Day's eighth and ninth causes of action assert that defendants violated California Labor Code § 232.5. Section 232.5 states, in relevant part:

"No employer may do any of the following: . . .

(c) Discharge, formally discipline, or otherwise discriminate against an employee who discloses information about the employer's working conditions."

■■■ As discussed, Day's only complaint regarding purported working conditions was her complaint that Grant and Calderwood drove under the influence of alcohol during an after-work event. For reasons already noted, Day's complaint regarding drunk driving does not disclose information regarding "working conditions." The parties cite no cases that interpret the term "working conditions" as it is used in § 232.5, and the court could find none. As used in other sections of the Labor Code, however, "working conditions" refers to conditions or practices at the employees' physical place of employment. See *Whitehead v. Corporation of Presiding Bishop of Church of Jesus Christ of Latter–Day Saints*, D059501, 2012 WL 6584301, *8 (Cal.App. Dec. 18, 2012) ("California Labor Code section 6310 . . . prohibits discharging an employee for making an oral or written complaint about unsafe working conditions or work practices in a place of employment"); *Cole*, 11 Cal.App.3d at 675, 90 Cal.Rptr. 74 (holding that Labor Code § 6400 et seq. requires an employer to maintain safe working conditions at the "place of employment").

Because Day's complaint regarding Grant's and Calderwood's drunk driving did not concern workplace conditions at her place of employment, but rather the activities of other employees during an after-work event, she cannot show that she "disclose[d] information about the employer's working conditions." CAL. LAB.CODE § 232.5. Defendants are therefore entitled to summary judgment on Day's claim that they violated Labor Code § 232.5 and in that manner terminated her wrongfully in violation of public policy.[158]

## G. Whether Defendants are Entitled to Summary Judgment on Day's Tenth and Eleventh Claims for Relief

■■■ Day's final claim alleges that defendants failed to prevent discrimination and failed to take action to stop unlawful harassment. Under FEHA, it is unlawful for an employer to "fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring." CAL. GOV'T CODE § 12940(k). See *Cozzi v. County of Marin*, 787 F.Supp.2d 1047, 1073 (N.D.Cal.2011) ("FEHA imposes an affirmative duty on employers to take all reasonable steps to prevent discrimination and harassment from occurring"). A cause of action under this section, however, is viable only if defendants have engaged in actionable discrimination. See *Trujillo v. N. County Transit Dist.*, 63 Cal.App.4th 280, 288–89, 73 Cal.Rptr.2d 596 (1998) ("Plaintiffs are asking us to rule that defendants owed them, specifically, a legal duty of care to take all reasonable steps necessary to prevent discrimination and harassment from occurring, and that a breach of such duty should give rise to a private right of action for damages. . . .

---

158. Day's ninth cause of action for wrongful termination in violation of public policy is predicated on her claim that defendants violated § 232.5. Because she has adduced no evidence that defendants violated the statute, it cannot form the basis for a wrongful termination claim.

However, plaintiffs have not suggested any persuasive reasoning or authority to support their position. We do not believe the statutory language supports recovery on such a private right of action where there has been a specific factual finding that no such discrimination or harassment actually occurred at the plaintiffs's workplace"); see also *Kohler v. Inter–Tel Tech.,* 244 F.3d 1167, 1174 n. 4 (9th Cir.2001) ("California courts have determined that the 'reasonable steps' language is only a basis for liability if the plaintiff proves that actual discrimination or harassment occurred"); *Cozzi,* 787 F.Supp.2d at 1073 ("[N]o suit may be maintained for violation of this affirmative duty [to prevent discrimination and harassment] if the plaintiff has not actually suffered any employment discrimination or harassment"); *Weaver v. Ormco Corp.,* No. G033036, 2007 WL 1520034, *12 (Cal.App. May 23, 2007) (Unpub. Disp.) ("[T]here must be a finding of actual harassment or discrimination under the FEHA for a plaintiff to prevail on cause of action under section 12940, subdivision (k)"). Here, Day has not raised triable issues concerning the fact that discrimination has occurred.

■■ The fact that the court concluded above that Day had a reasonable, good faith belief that Grant and/or others had created a hostile work environment in violation of FEHA does not demonstrate that she has raised triable issues of as to whether such an environment actually existed. To be actionable, harassment must be "sufficiently pervasive ... as to alter the conditions of employment and create an abusive work environment." *Hughes,* 46 Cal.4th at 1043, 95 Cal.Rptr.3d 636, 209 P.3d 963. Here, the specific incidents described by Day do not rise to the level of pervasiveness required to establish the existence of a hostile work environment. Although Day sent Jemo an email stating that she, as well as other employees, felt uncomfortable with the sexual comments and conduct of Grant and others, and that she shared other employees' concerns about a hostile work environment, she has adduced no direct evidence of incidents that she herself observed or experienced. None of the details in her complaints concern sexual comments or conduct directed at Day or occurring in her presence; rather, she was a conduit who relayed the complaints of other employees to Rea and human resources. This eliminates the possibility that Day herself was subjected to "an abusive work environment." See *Pereira v. Schlage Electronics,* 902 F.Supp. 1095, 1102 (N.D.Cal.1995) (a plaintiff not personally subjected to offensive remarks or touching may recover only if she establishes "that she personally witnessed the harassing conduct and that it [took place] in her immediate work environment"); *Lyle v. Warner Bros. Television Prod.,* 38 Cal.4th 264, 284, 42 Cal.Rptr.3d 2, 132 P.3d 211 (2006) ("[I]f the plaintiff does not witness the incidents involving others, those incidents cannot affect ... her perception of the hostility of the work environment" (internal quotation marks omitted)); *Fisher v. San Pedro Peninsula Hospital,* 214 Cal.App.3d 590, 611, 262 Cal.Rptr. 842 (1989) ("[O]ne who is not personally subjected to such remarks or touchings[ ] must establish that she personally witnessed the harassing conduct and that it was in her immediate work environment. For instance, it is not enough to allege that harassment occurred in the hospital; a plaintiff who is not a direct victim must also allege exactly what occurred in her presence in her immediate work environment and describe that work environment. In other words, if Ms. Fisher knew that Dr. Tischler was harassing nurses when he was in the operating room, but she did not work with him in that operating room, she would not have been exposed to a hostile work environment"); see also *Jenott v. St. Alphonsus Regional Medical Center,* No.

CV08–322–S–EJL, 2009 WL 5200524, *7 (D.Idaho Dec. 23, 2009) (concluding that conduct did not give rise to a hostile work environment because "the incidents occurred over a two and half year period and were *never aimed at the Plaintiff*" (emphasis added)).[159]

 Moreover, even had Day been present during the purportedly inappropriate conversations or observed the allegedly improper conduct, the few incidents alleged do not rise to the level of pervasiveness or severity required by FEHA. Whether the conduct is severe or pervasive is determined by reference to the following factors: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Kortan v. California Youth Auth.*, 217 F.3d 1104 (9th Cir.2000). To show that there was harassment under FEHA, Day must demonstrate that the purported wrongdoing was "more than a few isolated incidents." *Lyle v. Warner Bros. Television Prod.*, 38 Cal.4th 264, 284, 42 Cal. Rptr.3d 2, 132 P.3d 211 (2006). The only evidence in the record concerning harassment is Day's complaints. The complaints contain vague reports of a handful of inappropriate remarks about women and infidelity. The few remarks documented in the complaints are not sufficiently pervasive or severe that they violate FEHA. See *Bailey v. Los Angeles Unified School Dist.*, No. B186095, 2006 WL 3086163, *5 (Cal.App. Nov. 1, 2006) (Unpub. Disp.) ("[T]hree to five remarks" about women and sexual conduct were not "sufficiently pervasive to give rise to a hostile work environment"); *Haberman v. Cengage Learning, Inc.*, 180 Cal.App.4th 365, 382–86, 103 Cal.Rptr.3d 19 (2009) (six comments over a thirteen-month period no sufficient to establish a hostile work environment); *Muller v. Automobile Club of So. California*, 61 Cal.App.4th 431, 446, 71 Cal.Rptr.2d 573 (1998) (holding that two remarks by a supervisor, and one by a co-worker, did not constitute an actionable " 'concerted pattern of harassment of a repeated, routine or a generalized nature' "), disapproved on other grounds in *Colmenares v. Braemar Country Club, Inc.*, 29 Cal.4th 1019, 1031 n. 6, 130 Cal. Rptr.2d 662, 63 P.3d 220 (2003); see also *Jenott*, 2009 WL 5200524, at *6–7 (holding that although "[s]everal BHU employees used obscene language and discussed their dating/sexual activities," this was insuffi-

---

**159.** A plaintiff does not have standing to assert a claim that harassment was directed toward third parties if she is not a member of the same protected class as the victims. See *Gaub v. Professional Hosp. Supply, Inc.*, 845 F.Supp.2d 1118, 1133 (D.Idaho 2012) (noting that courts have "repudiated bystanders' claims for hostile work environment on the basis of standing where the bystander was not a member of the protected class that was the target of the hostile conduct"); see also *Medrano v. Genco Supply Chain Solutions*, No. 1:10–cv–01555, 2011 WL 92016, *5 (E.D.Cal. Jan. 11, 2011). Here, however, Day was a member of a protected class—i.e. female employees—that was purportedly victim of a hostile work environment. Although her emails to Rea and Jemo are vague concerning the identity of many of those who complained about Grant's behavior, Day states in her declaration that she "verbally elaborated," and advised Jemo that female employees "felt uncomfortable about the sexual comments and conduct by members of the Boys' Club." (Day Decl., ¶ 32). When a plaintiff is a member of the protected class and "hostility pervades a workplace," she has standing "even if such hostility was not directly targeted at the plaintiff." *McGinest v. GTE Service Corp.*, 360 F.3d 1103, 1117 (9th Cir.2004). As noted, however, to succeed on such a claim the plaintiff must demonstrate that the harassment was so pervasive that her specific work environment was effected. This generally requires a showing that the harassment occurred in her presence. See *Fisher*, 214 Cal. App.3d at 611, 262 Cal.Rptr. 842.

ciently pervasive or severe as to alter the conditions of the victim's employment).

Because Day has not demonstrated that she was a victim of discrimination or harassment, or that a hostile work environment existed, she cannot prevail on a claim that defendants failed to take reasonable steps to prevent such discrimination or harassment from occurring. The court therefore grants defendants' motion for summary judgment on Day's tenth and eleventh causes of action.[160]

### III. CONCLUSION

For the reasons stated, the court grants defendants' motion for summary judgment.

### JUDGMENT FOR DEFENDANTS

On March 13, 2013, the court entered an order granting defendants' motion for summary judgment. Accordingly,

IT IS ORDERED AND ADJUDGED

1. That plaintiff take nothing by way of her complaint; and

2. That the action be, and it hereby is, dismissed.

---

**160.** Even if Day were able to allege a claim for failure to take corrective action in response to harassment, such a claim would likely fail, as defendants responded to the complaints about Grant's behavior by initiating and conducting an investigation. See *Swenson v. Potter*, 271 F.3d 1184, 1197 (9th Cir.2001) (holding that a defendant employer responded adequately to complaints by initiating an investigation, even if plaintiff "perceived inadequacies in the investigation"). Defendants initiated an investigation promptly after Day's August 25 complaint, sought written reports from those involved, and in-

terviewed thirteen different employees. Such conduct is likely sufficient to avoid liability for failing to take corrective action. See *Fairley v. Potter*, No. C–01–1363 VRW, 2003 WL 403361, *9 (N.D.Cal. Feb. 13, 2003) (finding that an employer responded adequately because "Fairley's supervisors launched an immediate investigation, ... asking for written statements from both sides.... [T]he postal service immediately separated the two employees directly involved, warned the alleged harassers regarding inappropriate behavior and ordered them to stay away from the victims").